Edmund **BOULET**, et al., Plaintiffs,

v.

Argeo Paul **CELLUCCI**,
et al., Defendants.

No. CIV.A. 99–10617–DPW.

United States District Court,
D. Massachusetts.

July 19, 2000.

Neil V. McKittrick, Carol V. Rose, David S. Friedman, Hill & Barlow, Boston, MA, for plaintiffs.

Giny Sinkel, Atty. Gen.'s Office, Boston, MA, John E. Bowman, Jr., Government Bureau, Office of Atty. Gen., Boston, MA, for Argeo Paul Cellucci, Gerald Morrissey, Jr., defendants.

Giny Sinkel, Atty. Gen.'s Office, Boston, MA, for Andrew Natsios, defendant.

Thomas E. Kanwit, U.S.Atty.'s Office, Boston, MA, for Donna E. Shalala, interested party.

## MEMORANDUM AND ORDER

WOODLOCK, District Judge.

This case turns on the meaning of the mandate of the Medicaid Act that Medicaid "assistance shall be furnished *with reasonable promptness* to all eligible individuals." 42 U.S.C.A. § 1396a(a)(8) (emphasis supplied). The named plaintiffs are five mentally retarded adults eligible to receive

Medicaid services who, acting by and through their parents, have brought a class action lawsuit against state officials responsible for administering Massachusetts' Medicaid program. The plaintiffs' proposed class includes all mentally retarded or developmentally disabled individuals in Massachusetts who are not receiving Medicaid services for which they are eligible. They seek an injunction ordering the Commonwealth to provide them with such services—specifically, with respect to the named plaintiffs, residential habilitation services for which the plaintiffs have been on a waiting list for years—within a reasonable period of time.

I will certify a class somewhat narrower than that which plaintiffs propose and I will grant the plaintiffs' motion for partial summary judgment specifically declaring their entitlement within 90 days to residential habilitation services in a group home setting to the extent such settings exist. The record before me is unclear about the availability of such settings. Consequently, I will conditionally order a show cause hearing to allow defendants to move, if they choose, to establish an alternative transitional timetable for delivering plaintiffs the services they have requested.

## I. BACKGROUND

The parties broadly agree that the questions before me are questions of law and that no material facts are in dispute. Nonetheless, they strenuously and extensively debate contested points of fact. I agree that I am asked essentially to resolve points of law and that the disputes of fact are not now material. Accordingly, I will set out the undisputed facts together with a brief account of the disputed points.

### A. The Parties

The named plaintiffs are all unable to care for themselves and presently live with their parents [1]. All of the named plaintiffs have been declared eligible for Medicaid services, and in each case, the plaintiffs' parents have requested residential 24–hour–per–day services for their children. (Compl.¶¶ 9–12.) None of the plaintiffs has yet received the requested services, and all have been placed on a Department of Mental Retardation ("DMR") waiting list for these services. (*Id.*)

Plaintiff Edmund Boulet is 40 years old and lives with his parents Mary Ann and Gerald Boulet in Sharon, Massachusetts. He has been on the DMR waiting list for more than 10 years. (Compl.¶ 9.)

Plaintiff Richard Byers is 45 years old and lives with his parents Donald and Natalie Byers in Medford, Massachusetts. He also has been on the DMR waiting list for more than 10 years. (*Id.* ¶ 10.)

Plaintiffs Robert Dubord and Bryan Dubord are brothers and are 31 and 27 years old respectively. They live with their parents Marlene and Claude Dubord in Bridgewater, Massachusetts. Robert Dubord has been on the DMR waiting list for more than 9 years, and Bryan has been on the list for more than 5 years. (*Id.* ¶ 11.)

Plaintiff Bridget Studley is 25 years old and lives with her parents Fred and Fay Studley in Abington, Massachusetts. She has been on the DMR waiting list for more than 3 years. (*Id.* ¶ 12.)

The complaint defines the proposed class of plaintiffs as "all mentally retarded or developmentally disabled individuals in the Commonwealth of Massachusetts who are not receiving or have not received Medicaid services for which they are eligible." (*Id.* ¶ 20.) The plaintiffs assert that the class includes at least 3,000 people. (*Id.* ¶ 19.)

The defendants are the state officials—the governor of Massachusetts; the Secre-

---

**1.** Originally, there were six named plaintiffs. However, on May 25, 1999, I granted the motion of one of the plaintiffs, Valerie Anderson, to dismiss her claims without prejudice. (Mot. of Pl. Valerie Anderson to Dis-

miss.) Because of a deterioration in her health, Anderson no longer requested that Massachusetts immediately provide her with residential habilitation services. (*Id.* at 1.)

tary of the Executive Office of Administration and Finance of Massachusetts; the Secretary for the Executive Offices of Health and Human Services of Massachusetts; the Commissioner of the Division of Medical Assistance for the Executive Office of Health and Human Services of Massachusetts; and the Commissioner of the Department of Mental Retardation of Massachusetts—charged with administering the Medicaid program in Massachusetts.

## B. The Statutory Scheme

Medicaid is a joint federal-state program which aims to provide medical care to low-income individuals. *See* 42 U.S.C. § 1396 *et seq.; Visiting Nurse Ass'n. of North Shore, Inc. v. Bullen*, 93 F.3d 997, 999 (1st Cir.1996). Under the Medicaid program, the federal government "provides financial assistance to participating States to aid them in furnishing health care to needy persons." *Harris v. McRae*, 448 U.S. 297, 308, 100 S.Ct. 2671, 65 L.Ed.2d 784 (1980). States may choose whether or not to participate. "Once a State voluntarily chooses to participate in Medicaid, the State must comply with the requirements of Title XIX and applicable regulations." *Alexander v. Choate*, 469 U.S. 287, 105 S.Ct. 712, 714 n. 1, 83 L.Ed.2d 661 (1985). States electing to participate must submit a state plan, which must then be approved by the Federal Health Care Financing Administration ("HCFA"). *See Visiting Nurse Ass'n*, 93 F.3d at 999. Federal funds are then made available to pay for "medical assistance" which is defined in § 1396d(a) to include the full range of services and beneficiaries that a state may choose to cover in its plan.

The Medicaid provision which is the basis for the claim at issue here requires that a state plan must "provide that all individuals wishing to make application for medical assistance under the plan shall have opportunity to do so, and that such assistance shall be furnished with reasonable promptness to all eligible individuals." 42 U.S.C. § 1396a(a)(8). Two regulations follow from this statute. 42 C.F.R. § 435.911

provides that a state agency "must establish time standards for determining eligibility and inform the applicant of what they are. These standards may not exceed ... [n]inety days for applicants who apply for Medicaid on the basis of disability." Another regulation instructs, "The agency must—(a) Furnish Medicaid promptly to recipients without any delay caused by the agency's administrative procedures; [and] (b) Continue to furnish Medicaid regularly to all eligible individuals until they are found to be ineligible." 42 C.F.R. § 435.930. "Medical assistance" under the Medicaid Act includes payment of part or all of the cost of "services in an intermediate care facility for the mentally retarded" (hereinafter "ICF/MR"). 42 U.S.C.A. § 1396d(a)(xi)(15). The primary purpose of an ICF/MR is to provide health or rehabilitative services to mentally retarded individuals. *Id.* § 1396d(d)(1).

The Medicaid Act allows states to bring a broader range of services into Medicaid coverage through its waiver provision, which provides:

> The Secretary may by waiver provide that a State plan approved under this subchapter may include as "medical assistance" under such plan payment for part or all of the cost of home or community-based services (other than room and board) approved by the Secretary which are provided pursuant to a written plan of care to individuals with respect to whom there has been a determination that but for the provision of such services the individuals would require the level of care provided in a[n] ... intermediate care facility for the mentally retarded the cost of which could be reimbursed under the State plan.

42 U.S.C. § 1396n(c)(1). The Medicaid Act allows states to fund the waiver up to the per capita average payments that it would have made to fund ICF/MR services. 42 U.S.C. § 1396n(c)(2)(D). A state with a waiver program must inform individuals found to require the level of services provided by an ICF/MR "of the

feasible alternatives, if available under the waiver, at the choice of such individuals, to the provision of ... services in an [ICF/MR]." 42 U.S.C. § 1396n(c)(2)(C). States may determine a maximum number of individuals to whom they will offer waiver services, but the number may not be limited to fewer than 200. 42 U.S.C. § 1396n(c)(10).

## C. The Massachusetts Medicaid Program

Massachusetts participates in the Medicaid program and has filed a State Plan which the federal government has approved. (Compl. ¶ 27; Answer ¶ 27; Pls.' Ex. 1.) In the State Plan, Massachusetts commits to cover both "categorically needy" and "medically needy" individuals. (Statement of Undisputed Material Facts in Supp. of Pls.' Mot. for Summ.J. ("Pls.' Facts") ¶ 2; State Plan, Pls.' Ex. 1, at 12, 20, Attachment 2.2–A.). The Massachusetts Medicaid program includes coverage for services for qualified individuals in an ICF/MR. (Pls.' Facts ¶ 3; State Plan at 19, 20, 20a, Attachments 3.1–A at 7, 3.1–B at 6.)

Massachusetts also has a waiver plan, which has been approved by HCFA, "to provide home and community-based services to individuals who, but for the provision of such services, would require" ICF/MR services. (Pls.' Facts ¶ 4; Massachusetts Waiver, Pls.' Ex. 2, at 1.) Home or community-based services (other than room and board) are included as "medical assistance" for which federal funds are made available. 42 U.S.C.A. § 1396n(c)(1). The waiver covers services including residential habilitation, respite care, supported employment services, day services and support, and transportation and it applies to mentally retarded individuals who are either "categorically needy" or "medically needy." (Pls.' Facts ¶ 4; Waiver at 2–4, 11–14, 17, 23–24.) In order to qualify for waiver services, an individual must addi-

tionally have a severe enough disability that he or she would require the level of "active treatment" provided in an ICF/MR. (Pls.' Facts ¶ 5; Waiver at 36–37a.) The waiver specifies that "ALL adults who have an *extensive* or *pervasive* level of intensity of support needs on Dimension I (Intellectual and Adaptive Skills) ... qualify for [home and community-based] Waiver services." (Waiver at 37) (emphasis in original). Extensive support "refers to supports characterized by regular involvement" which are not time-limited, while pervasive support "refers to supports characterized by their constancy [and] high intensity." (*Id.*)

The waiver states that when an individual "is determined to be likely to require" the level of care provided by an ICF/MR, "the individual or his or her legal representative will be: 1. informed of any feasible alternatives under the waiver; and 2. Given the choice of either institutional or home and community-based services." [2] (*Id.* at 5.)

The waiver defines "residential habilitation" as:

assistance with acquisition, retention, or improvement skills related to activities of daily living, such as personal grooming, and cleanliness, bed making and household chores, eating and the preparation of food, and the social and adaptive skills necessary to enable the individual to reside in a non-institutional setting. Residential habilitation as used herein includes services and supports that assist individuals with mental retardation to gain independence and skills to live in the community, including in their natural/family home.... Residential habilitation also includes services and supports to others which enable the individual with mental retardation to remain living with the family in the natural/family home and to prevent institutionalization of the individual.... Residential habilitation does not include supports or

---

**2.** The waiver plan has been amended during the course of litigation. In quoting from the plan, I will cite to the sources that supply the currently operative language of the plan.

services for which federal financial participation is not available under Title XIX. Residential habilitation does not include and payments are not made for room and board, the cost of facility maintenance, upkeep and improvement, other than such costs for modifications or adaptations to a facility required to assure the health and safety of residents, .... Residential habilitation does not include and payments are not made for services or supports provided, directly or indirectly, by members of the individual's immediate family. Payments will not be made for the routine care and supervision which would be expected to be provided by a family or group home provider, ....

(Mark E. Reynolds, Acting Commissioner, Executive Office of Health and Human Services May 22, 2000 Letter to HCFA, p. 12.)

The waiver plan includes a HCFA form which constitutes "the Commonwealth's assurance that it will not submit claims for the cost of room and board where residential habilitation services are being provided in a residential setting other than the family home." (Supplemental Tummino Aff. ¶ 5, Defs.' Renewed Summ.J. Ex. M; May 22, 2000 Letter to HCFA, p. 70.) The form states that residential habilitation services "are furnished in residential settings other than the natural home of the individual (e.g., foster homes, group homes, supervised living arrangements, assisted living facilities, personal care homes, or other types of congregate living arrangements.)" (May 22, 2000 Letter to HCFA, p. 70.) The form further states

residential habilitation does not include, nor does Medicaid pay for the costs of the residence whether in the individual's family home or other residential setting. Therefore, payment is not made for room and board or the cost of facility acquisition, maintenance, upkeep and improvement, except where modifications or adaptations are required to assure health and safety of an individual

or to meet the requirements of the applicable life safety code.

(*Id.*)

### D. The Waiting List

DMR "maintains a waiting list of individuals eligible for and in need of DMR services." (DMR, *Facing the Waiting List Challenge: Responding to the Needs of Individuals and Families* (Sept. 20, 1996) (hereinafter *"Waiting List Challenge"*), Pl.'s Ex. 3, at 4.) More specifically, the list is for "individuals who are waiting for residential and/or day services." (*Id.*) DMR has maintained this list since at least 1988 and has recorded it on a computerized database since 1992. (Pls.' Facts ¶ 13; *Waiting List Challenge* at 4.) At the end of fiscal year 1998, the waiting list contained 3,014 individuals. (DMR, *Report on the Use of Funds for Services to Individuals on the DMR Wait List* (Jan. 1, 1999) (hereinafter *"1999 Report"*), Pls.' Ex. 4, at 2.) The individuals on the waiting list seek a variety of services, but DMR reported in 1996 that "[c]onsistently over time, the vast majority of individuals in need of services are in need of a residential service." (*Waiting List Challenge* at 4.) In that year, 72% of those on the waiting list were waiting for residential services only and 14% more were waiting for residential and day services. (*Id.*)

As the plaintiffs note, DMR has repeatedly highlighted the hardships encountered by individuals on the waiting list and their families. (Pls.' Facts ¶ 16.) For example, DMR wrote in 1996:

[T]he human side of this waiting list is far more compelling than any statistics can convey. Aging individuals live with elder caregivers. Young individuals remain at home after leaving special education. Families are in crisis because they do not have the means or the natural supports needed to care for their sons, daughters, sisters, and brothers. Given the fact that mental retardation is a life-long disability families are seeking services that would create a secure fu-

ture for their loved ones. Parents who have cared for their children since birth have dedicated their own lives in order to enrich their children's lives. They have added their names to the DMR waiting list, but their futures remain highly uncertain.

(*Waiting List Challenge* at i.) [3] Similarly, a 1998 DMR document commented, "The pain and stress experienced by those who have waited for services, often for years, is clear.... [I]t is evident that many individuals and families face multiple issues of serious nature and it is remarkable that so many have been able to 'hang on' for so long." (Jan. 30, 1998 Letters and Attachments from DMR Commissioner Gerald Morrissey, Pls.' Ex. 5, at 5.)

Individuals stay on the DMR waiting list for a prolonged period of time. Each of the named plaintiffs has 'been on the list for at least three years, and Edmund Boulet and Richard Byers have both waited for more than ten years. (Pls.' Facts ¶ 10.) The parties dispute whether the services plaintiffs seek are covered by Medicaid. While DMR Commissioner Morrissey wrote in a 1998 letter that, in acting to eliminate the waiting list, "all additional program funding would be offset by 40% in federal revenue," suggesting a belief that all waiting list services will be covered by Medicaid, (March 27, 1998 Letter, Pls.' Ex. 6 at 2), the defendants maintain the services plaintiffs seek are not covered by Medicaid.

The defendants point to several factors which show the waiting list situation to be somewhat more nuanced. They cite a separate study by the organization Family to Family, which addresses problems caused by the waiting list but also provides some information suggesting a less dire situation than the plaintiffs (and, ironically, DMR itself) portray. The study notes, "Caregivers, aware that the Waiting List exists and that their family members will need services eventually, placed their family members [sic] names on the list for that inevitable time when services would be needed." (Diane Griffiths, *Waiting in the Wings: Full Report on a Survey of Caregivers with Family Members on the Waiting List for Residential Services from the Massachusetts Department of Mental Retardation* (Nov.1997), Defs.' Ex. H, at vi.) The report stated that, of the caregivers surveyed with family members on the waiting list, while about 39% wanted services immediately or within a year, the remaining 60% do not need services for several years or until the distant future. (*Id.*) "The Waiting List represents a significant step in a planning process for these families." (*Id.*) The report does state, however that "eventually *all* caregivers will need residential services for their families" and notes that, of those surveyed, "[t]he majority (84%) describe either a group home or an apartment setting for their family member." (*Id.* at vi–vii) (emphasis in original).

The defendants stress that "residential services" can mean many different kinds of services, including in-home supports for the families of mentally retarded individuals.[4] (Defs.' Mem. of Law in Opp'n to Pls.' Mot. ("Defs.' Mem.") at 14.) They observe that many individuals on the waiting list, including the named plaintiffs, are current-

---

**3.** This passage illustrates an irony presented by this lawsuit. In this and other reports, DMR has shown a clear concern for individuals on its waiting list and a desire to address the problem that the list presents. In large part, the waiting list appears to be the result of resource allocation choices outside of DMR's control, and DMR has urged legislative action to correct the situation. (*See, e.g.,* March 27, 1998 Letter from DMR Commissioner Gerald Morrissey to Hon. Paul Haley, Pls.' Ex. 6.)

**4.** The defendants cite *Facing the Waiting List Challenge* which says that "[o]ne way to have a positive impact on the waiting list is to make sufficient in-home supports available to families." (Pls .' Ex. 3 at 14.) This passage does not make entirely clear, however, whether DMR is presenting in-home supports as a residential service fully meeting the needs of people on the waiting list or as a holding action to address immediate needs of individuals while they remain on the waiting list for a residential placement.

ly receiving some waiver services. (*Id.;* *Waiting List Challenge* at 4; Tummino Aff., Defs.' Ex. B, ¶ 19.) Finally, the defendants emphasize that, while the waiting list grew for many years, the number of people on the list decreased last year and is continuing to decrease this year because of new funding appropriations by the legislature and initiatives by the DMR. (Defs.' Mem. at 14–15; Tummino Aff., ¶¶ 14–16.)

### E. Services Available to the Named Plaintiffs

The defendants contend that the named plaintiffs have options beyond the small, community-based residential placements in which they seek services through this lawsuit. They assert that the named plaintiffs all were given the choice of placement in an institutional setting and declined that option. (Defs.' Mem. at 5.) The plaintiffs state, however, that they have never actually been offered a place in any state institution, (Reply Mem. in Supp. of Pls.' Mot. for Summ.J. ("Pls.' Reply") at 6), and they point out that admission to the large "state school" ICF/MR facilities has been closed pursuant to a federal consent decree since 1993. *See Ricci v. Okin,* 823 F.Supp. 984, 986 n. 1 (D.Mass.1993).

The defendants emphasize that the Commonwealth already provides significant services to the named plaintiffs and assert that the Division of Medical Assistance ("DMA") has paid approximately $260,000 since 1996 for services covered by Medicaid for the six original named plaintiffs.[5] (Defs.' Mem. at 5–6; McDowell Aff., Defs.' Ex. A, ¶ 4.) The defendants further state that in the case of plaintiff Richard Byers, his family had him placed on the waiting list long before they needed the requested services. (Defs.' Mem. at 8; Lincoln Aff., Defs.' Ex. E, ¶ 12.) The plaintiffs respond, however, that each of the five named plaintiffs has an immediate need for the requested residential services, and they provide each plaintiff's Individual Support Plan ("ISP")[6] prepared by DMR indicating needs for such services in the "immediate future" or at least suggesting that the named plaintiffs need the services "shortly." (Pls.' Facts ¶¶ 30, 34, 39, 44, 49; Pls.' Exs. 10–14.) The plaintiffs further assert that Byers' parents asked for immediate services earlier than the defendants' claim. (Pls.' Reply at 4; Byers Supplemental Aff. ¶ 4.)

The defendants contend that Bridget Studley's parents rejected a foster care placement for Bridget, and that, while DMR informed the Dubords that funding would be available this year to place Robert in a group home, "[t]here have not been any vacancies at the private-sector provider ... that the Dubords prefer," another provider had no vacancies, and the Dubords rejected a third possibility. (Defs.' Mem. at 10–11; Williams Aff., Defs.' Ex. F ¶¶ 18, 21, 44–47.) The plaintiffs counter that DMR has never arranged any actual foster care placements for Bridget, and that the Studleys have not yet authorized a foster care referral because DMR has not yet made a determination of Bridget's abilities that it had agreed to make before the Studleys consider foster care options. (Pls.' Reply at 6; Studley Second Supplemental Aff. ¶ 6.) They further assert that DMR has not yet furnished residential services for Robert Dubord or taken promised actions to lo-

---

**5.** This figure includes plaintiff Valerie Anderson, who is no longer a party to this suit. *See* note 1 *supra.*

**6.** In an amendment to the waiver plan, approved February 28, 2000, the ISP appears to have been renamed "Plan of Care." (Def.'s Renewed Summ.J., Ex. I at 37a, 51.) The waiver services identified in a Plan of Care "are based on an assessment of the individual's health and welfare needs and constitute services that are needed to prevent institutionalization." (*Id.* at 51.) A Plan of Care does not appear to differ substantively from the previous system under the ISP. (*Compare* Pls.' Facts at 10 n. 2.) Because the named plaintiffs have been assessed under the earlier ISP system, I will continue to use this nomenclature to refer to the plaintiffs' individual assessments of need and eligibility for services.

cate potential providers of these services. (Pls.' Reply at 7; Dubord Supplemental Aff. ¶ 6.)

The defendants state that each of the named plaintiffs has been notified of his or her rights to a hearing to appeal the ISPs but has not exercised that right. (Defs.' Mem. at 9–11.) The plaintiffs dispute that DMR has informed them of their right to appeal their ISPs. (Pls.' Reply at 8.) In any event, it does not appear that the services at issue in this litigation are subject to any ISP related dispute.

Finally, the plaintiffs contend that they are eligible for the services they seek, meeting the financial requirements and the required level of care. (Pls.' Fact ¶¶ 29, 34, 38, 43, 48.) The defendants do not appear to dispute the eligibility of the named plaintiffs and, indeed, the waiver services currently provided to the plaintiffs' and their presence on the DMR waiting list support the claims of eligibility.

### F. Procedural History

#### 1. The Original Posture

The plaintiffs brought their class action complaint on March 22, 1999. They assert three claims under 42 U.S.C. § 1983, alleging violations of: the "reasonable promptness" requirement of 42 U.S.C. § 1396a(a)(8) (Count I), due process (Count II), and equal protection (Count III). (Compl.¶¶ 47–58.) They assert two further claims alleging due process (Count IV) and equal protection (Count V) violations under the Massachusetts Declaration of Rights. (*Id.* ¶¶ 59–66.) They move for summary judgment on their § 1396a(a)(8) claim and seek an injunction ordering the defendants to provide the ICF/MR or home and community-based services for which they are eligible within 90 days or some other specifically defined reasonably prompt period. (Id. at 21.)

Three of the defendants—the Governor, the Administration and Finance Secretary, and the Health and Human Services Secretary—moved to dismiss contending the plaintiffs failed to allege an actual controversy as to them.[7] (Defs.' Mot. to Dismiss at 1.) Meanwhile, the defendants opposed the plaintiffs' motion for class certification asserting that significant differences exist in the individual circumstances of the members of the proposed class and that the proposed class is not adequately defined and clearly ascertainable. (Opp'n to Class Certification at 1.) The defendants additionally cross moved for summary judgment on plaintiffs' § 1396a(a)(8) claim.

#### 2. The Post Litigation Amendments by the Commonwealth

While the original motions to dismiss, for partial summary judgment and for class certification were under advisement and a decision was imminent, the Commonwealth without notice to either the plaintiffs or the court sought to change the relevant waiver provisions. On March 30, 2000, defendants' counsel informed the court for the first time that in December 1999 the Commonwealth had sought approval from HCFA to amend the waiver plan, including the definition of "residential habilitation." (*See* Mot. by Defs.' to Supplement Summ.J. Record, March 29, 2000, Ex. A.) HCFA apparently approved the proposed amendments on February 28, 2000. The amended definition of residential habilitation read, *inter alia:*

> Residential habilitation does not include supports or services for which there is no state appropriation available or for

---

**7.** As I earlier indicated to the parties, I will deny this motion to dismiss. The plaintiffs have pointed to statutes indicating that the three defendants each has control over the state's Medicaid program. (*See* Pls.' Mem. at 5–7.) A supervisory official may be liable under § 1983 "if the supervisor knew of, overtly or tacitly approved of, or purposely disregarded the conduct", at issue. *Maldonado–Denis v. Castillo–Rodriguez,* 23 F.3d 576, 582 (1st Cir .1994). The plaintiffs have alleged as much with respect to the roles of the three defendants who seek dismissal in the maintenance of the waiting list for residential services.

which federal financial participation is not available under Title XIX.

(*Id.*, Ex. A.) Essentially, the amended definition of residential habilitation provided the Commonwealth an escape hatch from plaintiffs' complaint, circularly requiring, or more accurately, permitting it to pay for residential services only if state appropriations were available for such services. (*Id.*) At a hearing on March 31, 2000, counsel for the Commonwealth, John E. Bowman, Jr., explained the delay in informing the Court of the submission of the proposed amendments and their subsequent approval as an "oversight" and characterized the Commonwealth's activities as being in "the regular course of business between the federal government and the fifty states under the Medicaid Act." (Defs.' Mem. in Opp'n to Pls.' Renewed Mot. for Summ.J. at 5.) [8]

Construing the newly worded definition of "residential habilitation" as materially altering the premises of this case, I denied without prejudice the plaintiffs' motion for summary judgment. On April 27, 2000, the plaintiffs renewed their motion for summary judgment arguing that the recent amendments were void and without effect because they were in violation of the Medicaid Act and HCFA had no authority to approve them. I issued a procedural order on April 27, 2000, inviting HCFA's participation either as an intervener or as an amicus curiae. On May 12, 2000, the defendants renewed their cross motion for summary judgment on plaintiffs' Medicaid claim.

### 3. The Role of HCFA

On May 22, 2000, before HCFA responded to the procedural order, the Commonwealth notified the court that it had sent another letter to HCFA requesting the deletion of certain recent amendments, specifically deletion of the phrase "for which there is no state appropriation available" to the definition of "residential habilitation." (*See* Petipas Aff., Ex. A.) I held another hearing on June 9, 2000, to shed light on this latest development and to determine the operative version of the waiver plan. At that hearing, HCFA, through its counsel, informed the Court that it would not seek to intervene or act as amicus curiae in this action. HCFA further notified the court that while it had not approved in writing the proposed May 22 modifications to the waiver plan, the phrase "for which there is no state appropriation available" in the definition of residential habilitation and corresponding descriptions of residential habilitation elsewhere in the plan was not part of the waiver plan as HCFA viewed it. This oral representation regarding the proposed modifications was restated in a June 19, 2000 letter from HCFA to the Commonwealth transmitted to the court on June 30, 2000.[9] In light on these de-

---

8. I feel obligated to repeat the observation I made during the hearing on March 31, 2000, that the failure of counsel—who was concededly aware of the Commonwealth's covert submission of proposed amendments to its waiver plan, which would materially affect the premises for judicial action on a motion then under advisement—to apprise the Court and the plaintiffs of the proposed amendments and their apparent adoption in a timely manner was unprofessional conduct. It was a breach of the duty of candor counsel owes the Court. More particularly, it should be beneath the dignity of a sovereign to engage in clandestine efforts to destroy the textual foundation upon which its most vulnerable citizens seek judicial protection without at a minimum some notice to the manifestly interested parties.

9. It bears noting that HCFA has maintained an oddly disinterested and aloof attitude toward this litigation, which plainly implicates its process for reviewing waiver plans. HCFA declined to offer the court any views regarding the proper construction of the plan language when inquired of by the defendants at the instance of the court following the hearing on the initial motion for summary judgment. (Bowman Letter September 1, 1999.) Despite the fact that there must therefore have been some awareness of the contested issues in this litigation, HCFA thereafter approved significant amendments to the plan. Even when plaintiffs in their renewed motion for summary judgment challenged its authority to approve the amendments, HCFA could not be roused to participate in this litigation in a timely fashion even as an amicus curiae. To

velopments, I now construe as the correct version of the waiver plan the May 22, 2000 draft, effectively returning the case to its original posture with renewed cross motions for summary judgment framing the statutory issue.

## II. STANDARD OF REVIEW

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A material fact is one which has the "potential to affect the outcome of the suit under applicable law." *Sanchez v. Alvarado*, 101 F.3d 223, 227 (1st Cir.1996). A genuine issue is "one that must be decided at trial because the evidence, viewed in the light most flattering to the nonmovant, would permit a rational factfinder to resolve the issue in favor of either party." *Medina–Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir.1990) (citations omitted).

Therefore, to succeed on a summary judgment motion, "the moving party must show that there is an absence of evidence to support the nonmoving party's position." *Rogers v. Fair*, 902 F.2d 140, 143 (1st Cir.1990). In order to preclude summary judgment, the nonmoving party must submit "sufficient evidence supporting the claimed factual dispute to require a choice between the parties' differing versions of the truth at trial." *LeBlanc v. Great Am. Ins. Co.*, 6 F.3d 836, 841 (1st Cir.1993), *cert. denied*, 511 U.S. 1018, 114 S.Ct. 1398, 128 L.Ed.2d 72 (1994) (internal quotations and citations omitted). In ruling on cross-motions for summary judgment, I must review the record in the light most favorable to the party opposing each summary judgment motion and indulge all reasonable inferences in that party's favor. *El Dia, Inc. v. Hernandez Colon*, 963 F.2d 488, 492 (1st Cir.1992).

## III. MEDICAID ACT CLAIM UNDER § 1983

### A. Preliminary Issues

The defendants have presented two preliminary challenges to the claim at issue which I must address before reaching the merits of the claim. Specifically, they assert (1) that § 1396a(a)(8) does not establish a right which the plaintiffs may enforce under § 1983 and (2) that this lawsuit violates the Eleventh Amendment.

■ *1. Enforceable Right* —Section 1983 imposes liability on anyone who, acting under color of state law, deprives an individual "of any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983. However, to bring suit under § 1983, "a plaintiff must assert the violation of a federal right, not merely a violation of federal law." *Blessing v. Freestone*, 520 U.S. 329, 340, 117 S.Ct. 1353, 137 L.Ed.2d 569 (1997). The Supreme Court has identified three factors which determine whether a statutory provision gives rise to a federal right: (1) Congress must have intended the provision to benefit the plaintiffs; (2) the plaintiffs must show that the right protected by the statute "is not so 'vague and amorphous' that its enforcement would strain judicial competence"; and (3) "the statute must unambiguously impose a binding obligation on the States ." *Id.* at 340–41, 117 S.Ct. 1353 (citations omitted); *see also Visiting Nurse Ass'n of North Shore, Inc. v. Bullen*, 93 F.3d 997, 1002–03 (1st Cir.1996).

date it has offered little more than the Delphic observation that, while it had not actually approved the most recent modifications to the waiver plan, it did not view the plan as including the provision "for which there is no state appropriation available," (which it had approved on February 28, 2000) as being included in the plan any longer. Under the circumstances, I view the decision of HCFA to offer no fully developed and sustained defense of its administrative practice to constitute a knowing and voluntary posture of indifference to the outcome of this litigation.

I note first that several courts have specifically found that § 1396a(a)(8) provides a right enforceable under § 1983. *See, e.g., Doe v. Chiles,* 136 F.3d 709, 715–19 (11th Cir.1998); *Lewis v. New Mexico Dep't of Health,* 94 F.Supp.2d 1217, 1233–36 (D.N.M.2000); *Sobky v. Smoley,* 855 F.Supp. 1123, 1146–47 (E.D.Cal.1994); *see also Albiston v. Maine Comm'r of Human Servs.,* 7 F.3d 258, 265 (1st Cir.1993) (finding that a "reasonable promptness" requirement, among other provisions, in the statute governing Aid to Families with Dependent Children creates rights enforceable under § 1983)[10]. I concur. First, in directing that medical assistance "shall be furnished with reasonable promptness to all eligible individuals," 42 U.S.C. § 1396a(a)(8), Congress clearly intended to protect those eligible individuals from undue delays. *See Doe,* 136 F.3d at 715; *Sobky,* 855 F.Supp. at 1146. The plaintiffs therefore are intended beneficiaries of the provision.

Second, I find § 1396a(a)(8) sufficiently definite to be judicially enforceable. *See Doe,* 136 F.3d at 717; *Sobky,* 855 F.Supp. at 1147. "A statute is not impermissibly vague simply because it requires judicial inquiry into 'reasonableness.' ... Rather, the relevant question is whether the action or purpose whose 'reasonableness' is commanded has been clearly delineated and is susceptible of judicial ascertainment." *Albiston,* 7 F.3d at 267. The fact that the state retains considerable discretion in determining the time period in which the medical services will be provided does not render the requirement of "reasonable promptness" unenforceable. *See Doe,* 136 F.3d at 717; *Wilder v. Virginia Hosp. Ass'n,* 496 U.S. 498, 519–20, 110 S.Ct. 2510, 110 L.Ed.2d 455 (1990). "While there may be a range of reasonable [time periods for provision of assistance], there certainly are some [time periods] outside that range

that no State could ever find to be reasonable ... under the [Medicaid] Act." *Doe,* 136 F.3d at 717 (alterations in original) (quoting *Wilder* 496 U.S. at 519–20, 110 S.Ct. 2510).

Following the analysis in *Doe* and *Wilder,* I find that, assuming the services sought by the plaintiffs are subject to § 1396a(a)(8)'s "reasonable promptness" requirement, the requirement is not too vague for judicial assessment. Certain periods of time, like the three to ten or more years plaintiffs have been waiting, are "far outside of the realm of reasonableness"—a conclusion which a court is perfectly capable of reaching. *Doe,* 136 F.3d at 717. This standard is in sharp contrast to the requirement of "reasonable efforts" to prevent removal of children from their homes and to facilitate reunification of families, which the Supreme Court found too vague to enforce in *Suter v. Artist M.,* 503 U.S. 347, 360–64, 112 S.Ct. 1360, 118 L.Ed.2d 1 (1992). The Court in *Suter* found that requirement to be "a directive whose meaning will obviously vary with the circumstances of each individual case." *Id.* at 360, 112 S.Ct. 1360. While the urgency of the plaintiffs' needs for requested services here may vary somewhat, case-by-case analysis is not required to determine a time frame that is reasonably prompt. In all cases, waiting periods of many years are outside of the zone of reasonableness.

Further, courts have found that regulations which provide guidance in interpreting a statutory provision lend support to a finding that the provision is enforceable. *See Doe,* 136 F.3d at 717; *Albiston,* 7 F.3d at 267; *Suter,* 503 U.S. at 359–60, 112 S.Ct. 1360. Here, 42 C.F.R. § 435.930 requires the state to "[f]urnish Medicaid promptly to recipients without any delay caused by the agency's administrative procedures" and to continue furnishing the aid

---

10. The defendants' assertion that *Albiston* was overruled on other grounds by *Blessing,* 520 U.S. at 340 n. 3, 117 S.Ct. 1353, is an overstatement. In *Blessing,* the Supreme Court found that a child support provision of the same statute, Title IV–D, did not provide a federal right, but did "not foreclose the possibility that some provisions of Title IV–D give rise to individual rights." *Id.* at 345, 117 S.Ct. 1353.

while the recipient remains eligible. This provision provides some definition to § 1396a(a)(8), by explicitly providing that delay due to administrative procedures is not reasonable. Another regulation provides that a state's time standards for determining applicants' eligibility may not exceed ninety days for applicants who apply to Medicaid on the basis of disability. 42 C.F.R. § 435.911. While this regulation is focused on eligibility determinations rather than the actual provision of services, it still gives some guidance to courts attempting to decide what time periods may be considered reasonably prompt in the larger context. These two regulations further develop the right set out in § 1396a(a)(8) and contribute to my finding that the section is sufficiently specific to be enforceable.

Finally, the plaintiffs must show that § 1396a(a)(8) unambiguously imposes a binding obligation on state agencies. Here, where the statute states that assistance "*shall* be furnished with reasonable promptness," 42 U.S.C. § 1396a(a)(8) (emphasis supplied), "[t]he language of the statute is undoubtedly cast in mandatory rather than precatory terms." *Doe*, 136 F.3d at 717; *see Sobky*, 855 F.Supp. at 1146–47. Indeed, the Supreme Court referred to a parallel statutory provision in the Social Security Act requiring states to provide aid to families with dependent children "with reasonable promptness" as an example in which Congress created a "federally imposed obligation" unambiguously and explicitly. *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17–18, 101 S.Ct. 1531, 67 L.Ed.2d 694 (1981) (quoting *King v. Smith*, 392 U.S. 309, 333, 88 S.Ct. 2128, 20 L.Ed.2d 1118 (1968)). Section 1396a(a)(8), in plain language, creates a stronger obligation than the "rather generalized duty" that the Supreme Court found in *Suter* to be insufficient to support

an enforceable right. 503 U.S. at 363, 112 S.Ct. 1360. The mandatory language at issue here unambiguously imposes an obligation upon Massachusetts to furnish medical assistance "with reasonable promptness."

In short, I find plaintiffs meet the requirements necessary to show that § 1396a(a)(8) establishes a federal right which the plaintiffs may enforce with a § 1983 lawsuit.[11]

*2. Eleventh Amendment* —The defendants argue that the Eleventh Amendment bars relief in this case. This argument proceeds from the defendants' conclusion that the plaintiffs have no right under federal statute to the services they seek, leaving state law as the only basis for any right the plaintiffs do have. (Defs.' Mem. at 36–37.) If this is so, the Eleventh Amendment bars enforcement by a federal court of a state law claim against state officials. *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100–01, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984) (Pennhurst II). Because both parties have moved for summary judgment on the plaintiffs' claim under *federal* law, I do not give this argument substantial consideration at this juncture. If the defendants are correct that plaintiffs have no entitlement under federal law, then plaintiffs cannot prevail on this claim regardless of the Eleventh Amendment, and the Eleventh Amendment need not enter my analysis. I only consider at this point whether the Eleventh Amendment bars enforcement of the plaintiffs' federal statutory claim.

The Eleventh Amendment provides that "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State . . . ."

---

**11.** I note that recourse under § 1983 may be unavailable where Congress has foreclosed private enforcement of the relevant statute "by providing an alternative, comprehensive administrative scheme for redressing individual plaintiffs' grievances under the statute." *Albiston* 7 F.3d at 262. Congress has not created such a scheme here, and the defendants do not argue otherwise.

The Supreme Court has held that this language bars suits against a state by citizens of that state and bars suits against state officials "when 'the state is the real, substantial party at interest.'" *Id.* However, the Court has created an exception to this rule, finding that a suit challenging the constitutionality of a state official's action is not a suit against the state. *Id.* at 102, 104 S.Ct. 900 (citing *Ex Parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908)). In more limited circumstances, suits against state officials asserting a violation of federal law are permissible. The Court in *Edelman v. Jordan,* 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974), "held that when a plaintiff sues a state official alleging a violation of federal law, the federal court may award an injunction that governs the official's future conduct, but not one that awards retroactive monetary relief." *Pennhurst II,* 465 U.S. at 102–03, 104 S.Ct. 900 (citing *Edelman,* 415 U.S. at 666–67, 94 S.Ct. 1347).

*Edelman* remains good law. It is true that the Supreme Court, in a majority section of a deeply divided opinion, observed more recently that "[t]o interpret *Young* to permit a federal court-action to proceed in every case where prospective declaratory and injunctive relief is sought against an officer, named in his individual capacity, would be to adhere to an empty formalism...." *Idaho v. Coeur d'Alene Tribe of Idaho,* 521 U.S. 261, 270, 117 S.Ct. 2028, 138 L.Ed.2d 438 (1997). Nevertheless, seven justices of the Court in two separate opinions concur *Coeur d'Alene Tribe* reaffirmed *Edelman*'s holding that suits against state officials may proceed when the plaintiffs seek prospective injunctive relief. *Id.* at 293–96, 117 S.Ct. 2028 (O'Connor J., concurring in part and concurring in the judgment for three justices preserving the *Edelman* distinction, but concurring that the Eleventh Amendment barred suit in that case), 303–05 (Souter, J., dissenting for four justices finding that the *Edelman* distinction allows suit in that case under the Eleventh Amendment).

Turning to the applicability of *Ex Parte Young* and *Edelman* to plaintiffs' § 1983 claims, the plaintiffs request an order that the defendants grant the requested services with reasonable promptness—an order affecting prospective action only. *See Lewis,* 94 F.Supp.2d at 1231 (recognizing plaintiffs' § 1983 claims against state officials as covered under the *Ex Parte Young* doctrine because plaintiffs sought prospective injunctive relief requiring officials to comply with Medicaid's reasonable promptness provision in the context of waiver services). While compliance would likely involve resource allocation choices, it would not in any sense mandate retroactive compensation for past inaction. *See Doe,* 136 F.3d at 719–21 (rejecting an Eleventh Amendment challenge to a lawsuit under § 1396a(a)(8) and a resulting injunction because the plaintiffs sought "prospective injunctive relief to enjoin state officials from continuing to violate federal law, that is, the Medicaid Act.")

Consequently, the Eleventh Amendment does not bar this lawsuit.

### B. Applicability of § 1396a(a)(8)

Section 1396a(a)(8) requires "medical assistance under the plan" be "furnished with reasonable promptness to all eligible individuals." The defendants contend that the services plaintiffs seek, which are characterized loosely in the papers as "group homes," are not subject to § 1396a(a)(8)'s requirement. I disagree.

*1. ICF/MR Services*—The plaintiffs specifically request that the court require the defendants "to offer all plaintiffs the full range of ICF/MR services or home and community based waiver services and other services for which they are eligible within 90 days or some other specifically-defined, reasonably prompt period." (Compl. at 21.) The named plaintiffs are apparently waiting for small, community-based 24–hour residential services. The plaintiffs contend that, although the state plan requires each ICF/MR to serve more

than 15 individuals,[12] (State Plan, Pls.' Ex. 1 at Supplement to Attachment 3.1A at 3b), the plan also allows for coverage of small, community based ICFs/MR which they would find acceptable. (Pls.' Reply at 12.)[13]

"Medical assistance" under the Medicaid Act includes payment of ICF/MR services, 42 U.S.C. § 1396d(a)(xi)(15), if a state has included these services in its state plan, which Massachusetts has. "[W]hen a state elects to provide an optional service, that service becomes part of the Medicaid plan and is subject to the requirements of federal law." *Doe*, 136 F.3d at 721 (quotation omitted). Accordingly, the state's provision of ICF/MR services is subject to § 1396a(a)(8)'s requirement that this type of "medical assistance" be provided "with reasonable promptness." Therefore, to the extent that the plaintiffs have requested ICF/MR services, the state must provide those services reasonably promptly.

*2. Waiver Services* —The Massachusetts waiver plan contemplates provision of "home and community-based" services. These services include the types of residential services sought by the plaintiffs. The defendants contend that the waiver only covers services for keeping mentally retarded individuals in their parents' homes. Their contention is wrong.

The waiver states that it includes services "that assist individuals to remain in their homes in the community," (May 22, 2000 Letter to HCFA, p. 12), but, as plaintiffs point out, it does not specify that "their homes" must be their parents' homes.[14] The waiver does state that residential habilitation "also includes those supports deemed necessary to enable the family to remain living together," and that

"residential habilitation may be provided in the family home of the individual," (*Id.* at 12, 70), but it by no means restricts the definition to such services. The waiver unambiguously states that residential habilitation services, apart from respite care, "are furnished in residential settings other than the natural home of the individual" and specifically in "group homes," among other arrangements. (*Id.* at 70) This passage is sufficient to defeat the defendants' contention that the services plaintiffs seek are not covered in the Massachusetts waiver.

The prohibition on funding for room and board does not advance the defendants' position. The waiver provides for payment for services at the residential placements they seek, with the room and board payments coming from sources other than Medicaid. The waiver even provides "an explanation of the method used by the State to exclude Medicaid payment for room and board" in connection with residential habilitation services, (*id.*), and instructions for division of payments for residential services between Medicaid and other sources appear in the Code of Massachusetts Regulations, *see* 115 C.M.R. § 3.05(5)(c). For the defendants to assert that the waiver could not cover such services if Medicaid cannot pay for room and board is distracting at best and misleading at worst. The plaintiffs seek provision of 24–hour services covered by Medicaid, conceding that the room and board portion of any placement must be paid from another source. I find that the services plaintiffs seek, excluding the costs of room and board, are covered under the Massachusetts waiver. I turn my inquiry now to

---

12. As I noted above, admission to large "state school" institutions is currently not possible.

13. The Code of Massachusetts Regulations provides support for the plaintiffs' position, listing ICFs/MR under the heading of "Alternatives to Institutional Care" and stating, "Community intermediate care facilities for the mentally retarded (or for persons with related conditions) are small community-based residential programs for 15 or fewer residents." 130 C.M.R. § 433.482.

14. Indeed, the Code of Massachusetts Regulations defines "home" as "the house, apartment, or other place in which the individual lives in the community." 115 C.M.R. § 7.02.

whether those waiver services are subject to § 1396a(a)(8).

3. *Entitlement to Waiver Services* —Section 1396n(c)(1) provides that a state plan may include "as 'medical assistance' under such plan," payment for home or community-based waiver services. Accordingly, Massachusetts waiver services would appear to be included in the "medical assistance" which the state must provide with "reasonable promptness" under § 1396a(a)(8). However, the defendants assert that, while the state has the option of providing waiver services, individuals have no legal entitlement to such services and therefore may not demand that the services be furnished promptly.

The defendants appear to be correct that Congress meant for the waiver provision to expand, not restrict, the horizons of what states may do in providing services to eligible people. "Waivers are intended to provide the flexibility needed to enable States to try new or different approaches to the efficient and cost-effective delivery of health care services, or to adapt their programs to the special needs of particular areas or groups of recipients." 42 C.F.R. § 430.25(b). The Second Circuit, noting that the waiver program is voluntary for states and may include a waiver of several requirements but not the "reasonable promptness" requirement of the Medicaid Act as well as a cap on beneficiaries, concluded, "Certainly no broad or categorical entitlement can be deemed secured under a program that allows a state to impose a limit of as few as 200 people on the total number of participants." *Skandalis v. Rowe,* 14 F.3d 173, 181 (2d Cir.1994). I note, however, that the Second Circuit in *Skandalis* was upholding a Connecticut restriction on eligibility for a waiver program (by income, in that case), and found that the state could maintain more stringent eligibility requirements for the waiver program than for Medicaid as a whole. *See id.* at 175, 181–82. It appears the Second Circuit was correct in noting that the waiver statute allows limitations and restric-

tions on eligibility for waiver programs not allowed for other Medicaid programs. The *Skandalis* court, however, did not examine the issue whether those individuals who *are* eligible under the waiver plan, as the plaintiffs are in this case, are subject to the protections of the Medicaid Act. *See also Beckwith v. Kizer,* 912 F.2d 1139 (9th Cir.1990) (upholding a California restriction on eligibility for a waiver program, in that case by hospitalization history, but not addressing the rights of people eligible for the program).

Traditional statutory analysis supports a finding that, once a state opts to implement a waiver program and sets out eligibility requirements for that program, eligible individuals are entitled to those services and to the associated protections of the Medicaid Act. The Medicaid Act mandates that the federal government only approve a waiver plan if that plan provides satisfactory assurances "individuals who are determined to be likely to require the level of care provided in [an] ... [ICF/MR] are informed of the feasible alternatives, if available under the waiver, at the choice of such individuals, to the provision of ... services in an [ICF/MR]." 42 U.S.C. § 1396n(c)(2)(C). In this case, the alternatives at issue are available under the waiver (the statute does not specify that placements be available), as explained above. Requiring that the state inform individuals of feasible alternatives "at the choice of such individuals" would mean little if the eligible individuals were not entitled to these alternatives. If the state were free arbitrarily to say no, then this section would require nothing other than meaningless paperwork. The associated regulation is more explicit, providing that recipients must be "(1) Informed of any feasible alternatives available under the waiver; and (2) given the choice of either institutional or home and community-based services." 42 C.F.R. § 441.302(d).

Several courts have accepted the proposition that the Medicaid Act's waiver provi-

sions create an entitlement to waiver programs once states choose to implement them. As noted above, the Eleventh Circuit held in a different context that when a state chooses to provide an optional service, the service "becomes a part of the state Medicaid plan and is therefore subject to the requirements of federal law." *Doe,* 136 F.3d at 720 (quotation omitted). The *Doe* court also noted that " '[i]nadequate state appropriations do not excuse noncompliance' with the Medicaid Act." *Id.* at 722 (quoting *Alabama Nursing Home Ass'n v. Harris,* 617 F.2d 388, 396 (5th Cir.1980)). More to the point, Judge Ferguson in the Southern District of Florida has concluded that "The freedom of choice provision creates binding obligations on any state that elects to provide supports and services in homes pursuant to the Home and Community-Based Waiver." *Cramer v. Chiles,* 33 F.Supp.2d 1342, 1351 (S.D.Fla.1999). He further found that neither the hope of a future placement after years on a waiting list nor an option which may not meet an individual's needs constitutes a meaningful choice as contemplated by § 1396n(c)(2). *Id.* at 1352. I agree. Because Massachusetts has chosen to implement a waiver plan, the waiver statute provides eligible individuals in Massachusetts with an entitlement to waiver services and affords them the full protections of the Medicaid Act with regard to those services.

The cap on waiver services is simply a constraint on eligibility. The cap on the number of individuals who may receive waiver services in 1999 was 11,280. The number goes down to 10,514 for fiscal year 2000 and then increases to 11,139 and 11,764 for fiscal years 2001 and 2002, respectively. (Defs.' Renewed Summ.J., Ex. J.)[15] The federal statute permits such a cap providing only that the number of individuals who receive waiver services may not be limited to fewer than 200. 42 U.S.C. § 1396n(c)(10).

I note first, in practical terms, that the defendants have indicated that Massachusetts has not reached the cap (they say they are "near" it), although they have not indicated how far below it they currently are, (Defs.' Mem. at 20–21). The cap, however, decreases by almost 800 individuals for fiscal year 2000. Defendants have not supplemented the record on how this affects plaintiffs' claims. More fundamentally, as plaintiffs point out, many of those on the waiting list, including the named plaintiffs, are currently receiving waiver services and so are already included under the cap. Granting these individuals the additional waiver services they are waiting for may not bring the state over the cap.

Second, on a theoretical level, a cap may be problematic. Massachusetts can place a limit on the number—above 200—of people who receive waiver services, and this number can be lower than the number of people who request such services. Under such circumstances, while all eligible individuals are entitled to waiver services, the statutory scheme allows a cap which may prevent some of those eligible individuals from receiving the services they request. This theoretical construct treats a cap as something distinct from the eligibility requirements. As a practical matter, the statute can best be read to mandate that, once a state chooses to implement a waiver program and chooses the eligibility requirements, a cap is simply another eligibility requirement for that program. The cap for all intents and purposes operates like those further eligibility requirements approved in *Skandalis* and *Beckwith.* Individuals who apply after the cap has been reached are not eligible, or alternatively, the waiver services are not "feasible" for them until the cap has risen to include them. In any case, I find that the eligible individuals under the cap are entitled to waiver services. In short, the cap does

---

15. These numbers were recently amended along with other provisions of the waiver plan. The previous caps for fiscal years 1999 to 2002 were 11,280, 11,965, 12,650, and 13,335. (Sept. 21, 1998 Letter from Roger Perez, Defs.' Ex. G.)

not support the defendants' position that the state has total discretion in providing waiver services.

The defendants also contend that the Medicaid Act's cost-effectiveness requirement for waiver services indicates that individuals are not entitled to those services. Specifically, the statute requires that the average per capita expenditure for waiver services may not exceed the average per capita expenditure that would have been made on the same individuals without the waiver. 42 U.S.C.A. § 1396n(c)(2)(D). On a practical level, the defendants provide no evidence that the services at issue in this case will be less cost-effective than institutional services. I do not find that the cost-effectiveness provision indicates that individuals are not entitled to waiver services. Rather, the statute makes clear that individuals are entitled only to cost-effective or "feasible" services, and it defines a clear standard for determining cost-effectiveness. That the statute creates eligibility requirements and limitations for the waiver services does not remove any obligation from states implementing the waiver program they have themselves fashioned.

Finally, I note that at least two courts have confronted the same issue and both have found that waiver services are subjected to all Medicaid requirements and specifically to § 1396a(a)(8). *See McMillan v. McCrimon*, 807 F.Supp. 475, 481–82 (C.D.Ill.1992) ("The fact that the HSP [a waiver program] is an optional service does not exempt it from the requirements of section 1396a(a)(8)."); *Lewis*, 94 F.Supp.2d at 1234 (concluding that "Congress intended the 'reasonable promptness' requirement to apply to waiver services"). The *McMillan* court pointed out that while § 1396n(c)(3) permits a waiver of certain uniform requirements of the Medicaid Act—the statewideness, comparability, and income requirements—for waiver programs, it provides for no such waiver of the "reasonable promptness" requirement. *Id.* at 482. I find that the

plaintiffs are entitled to those waiver services which they have requested and for which they are eligible and further that § 1396a(a)(8) applies to waiver services as well as to services under the state plan.

## C. Violation of Reasonable Promptness Requirement

The defendants contend that even if § 1396a(a)(8) does apply to the plaintiffs and to waiver services, they have not violated the requirement of reasonable promptness. To the extent settings are available for the delivery of the waiver services, I reject this contention.

■ *1. Provision of Other Services —* The defendants argue that the named plaintiffs and many others on the waiting list are receiving some services, that they received those services reasonably promptly, and that they are not entitled to the specific service of their choice with reasonable promptness. The defendants point to *King v. Sullivan*, 776 F.Supp. 645 (D.R.I. 1991) and *King v. Fallon*, 801 F.Supp. 925 (D.R.I.1992), two opinions in the same case in which Judge Lagueux denied the plaintiffs' request for relief under § 1396a(a)(8), among other statutes, when the plaintiffs had been offered placement in state ICFs/MR as mandated by the state plan but preferred placements in smaller community-based dwellings. Judge Lagueux found that the state was not obligated to provide any more than it promised in its state plan and that, where private placements were scarce and not mandated by the state plan, a waiting list was appropriate. *See King v. Sullivan*, 776 F.Supp. at 652, 656; *King v. Fallon*, 801 F.Supp. at 933.

Here the state plan promises ICF/MR services, as well as waiver services, which I found above to be an entitlement for eligible individuals at least up to the cap. Massachusetts has not offered any of these services to the plaintiffs and certainly not in a way that matches their individual needs. Because Massachusetts has promised and failed to deliver in a reasonably

prompt way the contested services, I find the *King* decisions inapposite. To the extent that those decisions hold that the state must only provide services in facilities if those facilities are available, I concur. The record before me, however, is unclear as to the existence of such facilities.

The plaintiffs have all requested 24–hour residential services. The fact that they have been receiving other services and that they might be able to receive placements in large institutions (though they claim never to have been offered such placements) cannot be sufficient to satisfy § 1396a(a)(8). That section provides "that all individuals wishing to make application for medical assistance under the plan shall have opportunity to do so, and that such assistance shall be furnished with reasonable promptness to all eligible individuals." While the language is not explicit on the point, I do not read it to apply only to an initial request for services, after which no protection is afforded to requests for new and different services for as long as those original services are provided. Nor do I read the provision to require, when it says "such assistance shall be furnished," only some assistance, at the total discretion of the state. Rather, the assistance must correspond to the individual's needs, and, as explained above, the state has recognized that those individuals on the waiting list, and the named plaintiffs in particular, need the services for which they are waiting.

The choice between institutional and home or community-based services sanctioned in § 1396n(c)(2)(C) would be rendered essentially meaningless if states which had implemented a waiver program could escape the promptness requirement and other requirements that would force them to make the waiver services available simply by providing some other services or some other choice to eligible individuals. *Cf. Cramer*, 33 F.Supp.2d at 1353 ("Underfunding of the Home and Community–Based Waiver program compels institu-

tionalization, thus negating meaningful choice.") Accordingly, I find that the defendants have not fulfilled their obligations under § 1396a(a)(8) in provision of some other waiver services to the plaintiffs if settings exist for the delivery of such services.

█ *2. Waiting List* —Having determined that § 1396a(a)(8) does apply to all of the services sought by the plaintiffs and that it is not satisfied by other services the plaintiffs are receiving or might be offered, a determination that the waiting list violates the "reasonable promptness" requirement if settings are available for the services plaintiffs request follows ineluctably. The Supreme Court wrote of the parallel section governing Aid to Families with Dependent Children:

> That section was enacted at a time when persons whom the State had determined to be eligible for the payment of benefits were placed on waiting lists, because of the shortage of state funds. The statute was intended to prevent the States from denying benefits, even temporarily, to a person who has been found fully qualified for aid.

*Jefferson v. Hackney*, 406 U.S. 535, 545, 92 S.Ct. 1724, 32 L.Ed.2d 285 (1972). Judge Levi extrapolated sensibly, "It follows from *Jefferson* that the Medicaid Act's reasonable promptness requirement, set forth as § 1396a(a)(8), prohibits states from responding to budgetary constraints in such a way as to cause otherwise eligible recipients to be placed on waiting lists." *Sobky v. Smoley*, 855 F.Supp. 1123, 1148 (E.D.Cal.1994).

First, I note that § 1396a(a)(8)'s statement that "medical assistance" be furnished with reasonable promptness indicates that the reasonable promptness requirement must apply to the services themselves, rather than only to eligibility determinations, as the defendants argue. *See Sobky*, 855 F.Supp. at 1147. Additionally, as several courts have pointed out, inadequate funding does not excuse failure to comply with the rea-

sonable promptness requirement. *See Doe*, 136 F.3d at 722; *Sobky* 855 F.Supp. at 1148. Finally, the time periods at issue in this case clearly violate the requirement of reasonable promptness. As noted already, § 1396a(a)(8) was specifically intended to prevent waiting lists. Further, as the Eleventh Circuit commented in a case involving waiting lists for entry into ICF/MR facilities, "it is axiomatic that delays of several years are far outside the realm of reasonableness." *Doe*, 136 F.3d at 717. Here, where some of the delays extend more than a decade, I have little trouble finding that the defendants have not been reasonably prompt if facilities are available for offering the requested services. The record is unclear on the availability of such facilities. Accordingly, I find that all of the requested services are subject to § 1396(a)(8)'s requirement and that defendants have failed to meet that requirement if facilities where their delivery can take place are available.

## IV. CLASS CERTIFICATION

The plaintiffs seek to certify a class composed of "all mentally retarded or developmentally disabled individuals in the Commonwealth of Massachusetts who are not receiving or have not received Medicaid services for which they are eligible." (Compl.¶ 20.) I will grant plaintiffs' motion for certification, but amend the proposed class only to include all mentally retarded or developmentally disabled adults in Massachusetts who are eligible to receive Medicaid services under the plan's cap and who are currently on a waiting list for such services.

A class may be certified only if the proposed class satisfies the requirements of Fed.R.Civ.P. 23(a). Rule 23(a) requires for certification:

(1) the class is so numerous that joinder of all members is impracticable,

(2) there are questions of law or fact common to the class,

(3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and

(4) the representative parties will fairly and adequately protect the interests of the class.

Additionally, those seeking declaratory and injunctive relief, as plaintiffs are here, must satisfy Rule 23(b)(2), which states that "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole."

*1. Numerosity* —The numerosity requirement is easily met as the class of persons waiting for DMR services is over 3,000 and individual joinder would be impractical, especially in light of the particular circumstances of plaintiffs' medical and financial circumstances. Defendants challenge the numerosity of the class on the basis that plaintiffs have submitted no evidence of how many of the 3,000 individuals actually claim that they are not receiving or have not received Medicaid services for which they are eligible. As stated above, however, the waiting list has been defined as a list of "individuals eligible for and in need of DMR services." Moreover, a report prepared by DMR stated that in 1996 the vast majority of individuals in need of services are in need of a residential service. These pronouncements issued by the DMR satisfy me that the number of plaintiffs is sufficiently high to satisfy the numerosity requirement of Rule 23(a).

*2. Commonality and Typicality* —The second and third prongs of Rule 23(a) require plaintiff to demonstrate that "there are questions of law or fact common to the class" and that "the claims or defenses of the representative parties are typical of the claims of the class." Defendants argue there is neither commonality nor typicality here because of the unique profile and circumstances of each plaintiff which require varying support services.

While the plaintiffs have unique medical and support requirements, this does not change the fact that this class action raises the same basic claim stemming from deficiencies in the operation of the Commonwealth's Plan. Rule 23(a)(2) requires plaintiffs to show that common questions of law or fact exist and that class members' claims are not in conflict with one another; it does not require that class members' claims be identical. *Guckenberger v. Boston University,* 957 F.Supp. 306, 325 (D.Mass.1997). I find the claims of the plaintiffs and the proposed class as amended share a common legal theory that adults eligible for waiver services are not being provided such services with reasonable promptness and, therefore, satisfy the commonality and typicality requirements of Rule 23(a). To the extent defendants object to the proposed class embracing all developmentally disabled individuals including those under age 18, my modification of the definition of the proposed class cures this overbreadth.

*3. Adequacy of Representation* —The adequacy rule requires that plaintiffs demonstrate that their interests will not conflict with those of class members and that their counsel is qualified, experienced and able to vigorously conduct the proposed litigation. *Andrews v. Bechtel Power Corp.,* 780 F.2d 124, 130 (1st Cir.1985). I have already determined that plaintiffs' claims do not conflict with those of the proposed class members; to the contrary they state common injuries and legal theories. Furthermore, counsel for the plaintiffs are able to deploy skills and resources more than adequate to represent the interests of the class. Indeed, defendants do not challenge the adequacy of representation per se.[16]

*4. Defendants Acted on Grounds Generally Applicable to the Class* —Plaintiffs seek declaratory and injunctive relief for the class as a whole to remedy the defendants' practice of placing eligible individuals on a waiting list for services. Insofar as defendants' actions are applicable to the class as a whole, the plaintiffs argue that relief with respect to the class as a whole is appropriate. As the First Circuit has explained, if injunctive or declaratory relief is appropriate with respect to the whole class, certification is proper. *Dionne v. Bouley,* 757 F.2d 1344, 1356 (1st Cir.1985).

Certification is likewise appropriate where there is a danger that the individual claims may be mooted, or a declaration of rights with respect to one plaintiff may not automatically translate into an appropriate relief for other class members, and when certification would not impose any additional burden on the court. *Id.* Plaintiffs claim the risk of mootness here is real. Since the filing of the complaint, the plaintiff Anderson has suffered a deterioration in her health that has led to her withdrawing her waive request, *see* note 1 *supra,* and the DMR has informed plaintiff Robert Dubord that funding is now available for the residential Medicaid services he seeks. Throughout this litigation named plaintiffs may be expected to face the possibility of mootness because the circumstances of both their personal situation and the situation of their elderly caregivers is so precarious. Given that defendants are acting or refusing to act in a manner that is "generally applicable" to the entire class, I find the proposed class certification as amended appropriate.

## V. REMEDY

The plaintiffs seek an order mandating that the defendants provide services to eligible individuals within a short, specifically defined time. They propose 90 days, following the maximum time frame set out in 42 C.F.R. § 435.911 for eligibility deter-

---

**16.** Defendants do suggest a conflict of interest for the law firm of Hill & Barlow in pursuing this case and at the same time representing a class of mentally retarded residents of five state schools seeking an adequate level of care in the *Ricci v. Callahan* litigation. I see nothing in the *Ricci* consent decree, which closed admissions to the five state schools, that is related to this action in any way to preclude representation by Hill & Barlow.

minations as well as the time frame approved by *Doe* for provision of services similar to those at issue in this case. *See* 136 F.3d at 720–21. On its face such a time period appears to make sense at least over the long term. Massachusetts should be able to respond to each new request for plan or waiver services by providing those services within 90 days if the applicant is eligible, the services are feasible, and settings are available for the delivery of these services.

The record is not adequate to say whether certain of the services which are in dispute, particularly group home settings, are available. The availability of settings depends ultimately upon demand and demand in this context undoubtedly turns to some considerable degree on the likelihood of reimbursement for the services necessary to function in such settings. The rulings in this case cannot create new settings but they can and are intended to encourage vendors to be willing to provide both the settings and the services to meet the promise of the Massachusetts waiver plan by assuring reimbursement up to the waiver cap. However, in light of the deficiencies in the record, in particular regarding the availability of group home settings, I will afford the defendants an opportunity to show cause, if they choose to do so, why 90 days is not a feasible timetable at this point and to propose transitional modifications to the order.

## VI. CONCLUSION

For the reasons discussed more fully above, I hereby a) DENY the defendants' motion for summary judgment and b) GRANT the plaintiffs' motion for summary judgment. Accordingly, it is hereby ORDERED and ADJUDGED and DECREED:

Upon consideration of the mandate of 42 U.S.C. § 1396a(a)(8) that medical assistance be furnished to eligible individuals with reasonable promptness, the defendants shall provide within 90 days of the entry of this decree all those on the waiting list eligible for services pursuant to the Massachusetts waiver plan with such waiver plan services—including, but not limited to, residential habilitation services in a group home setting—no later than 90 days after their placement on that waiting list, and it is

FURTHER ORDERED that the defendants may show cause, if any there be, why on a transitional basis 90 days is an insufficient period to provide such services and propose an alternative transitional schedule. Written submissions by the defendants shall be made on or before August 15, 2000, responses by plaintiffs shall be made on or before September 15, 2000 and, if necessary, any hearing will be held on September 27, 2000 at 2:30 p.m.