**ALEXANDER A.**, by his next friend, Heather **BARR**, Bernadette B., by her next friend, Susan Jacobs, and Claudia C., by her next friend, Monica de la Torre, individually and on behalf of all other similarly situated, Plaintiffs,

v.

Antonia C. **NOVELLO**, M.D., in her official capacity as Commissioner of the New York State Department of Health, and James Stone, in his official capacity as Commissioner of the New York State Office of Mental Health, Defendants.

Civ.A. No. 99–CV–8418.

United States District Court, E.D. New York.

Sept. 12, 2002.

Nancy Rosenbloom, The Legal Aid Society Civil Appeal & Law Reform Unit, New York City, Robert L. Schonfeld, Stein & Schonfeld, Garden City, NY, for plaintiffs.

Mark D. Rosenzweig, Attorney General, State of New York, New York City, for defendants.

## MEMORANDUM AND ORDER

TRAGER, District Judge.

Plaintiffs Alexander A., Bernadette B., and Claudia C., on behalf of themselves and all others similarly situated, brought an action

against Antonia C. Novello, M.D., in her official capacity as Commissioner of the New York State Department of Health ("DOH"), and James Stone, in his official capacity as Commissioner of the New York State Office of Mental Health ("OMH"), alleging violations of Title XIX of the Social Security Act of 1965, 42 U.S.C. § 1396, *et seq.* ("Medicaid Act") and Title II of the Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq.* Plaintiffs now move to certify a plaintiff class defined as follows:

> All New York State children with psychiatric disabilities who have been or will be found by defendants to be appropriate for placement in a Residential Treatment Facility and who have not been or will not be provided with such placement with reasonable promptness.

Pl. Proposed Order. Defendants do not oppose class certification.

Plaintiffs also move for partial summary judgment on their claim that defendants have violated and continue to violate their right to receive Medicaid services by failing to place plaintiffs in Residential Treatment Facilities ("RTF") with "reasonable promptness" as required by the Medicaid Act.

### Background

The State of New York participates in the federal Medicaid program established under the Medicaid Act. *See* Statement of Undisputed Material Facts in Support of Plaintiff's Motion for Partial Summary Judgment ("Pl.'s Rule 56.1"), ¶ 1. As a condition for the receipt of those funds, the State of New York has submitted a State Medicaid Plan ("Plan") that has been approved by the Secretary of the United States Department of Health and Human Services. *See id.* In the Plan, the State has committed to provide Medicaid services to both the "categorically needy"[1] and the "medically needy"[2] individuals. *See id.* ¶ 2. Children certified as eligible for RTF placement may be entitled to receive Medicaid as either "categorically needy" or "medically needy" individuals, based on their dis-

ability. *See id.* ¶ 3. At least 95 percent of plaintiff-proposed class members are Medicaid eligible in one of the two categories. *See id.*

The DOH is designated as the single state agency for administering or supervising the administration of the New York State Medicaid Program and the Plan. *See id.* ¶ 6. It is responsible for making Medicaid eligibility determinations and operating all aspects of the state's Medicaid Program. *See id.*

The OMH is the executive department responsible for developing and providing "comprehensive plans, programs, and services in the areas of research, prevention, and care, treatment, rehabilitation, education, and training of the mentally ill." *Id.* ¶ 8 (quoting N.Y. Mental Hyg. L. § 7.07).

RTF's were established by statute and regulation in 1981. *See id.* ¶ 18. The State authorized 600 RTF beds to be opened. *See id.* ¶ 19. However, OMH has never opened the maximum authorized number of beds. *See id.* The number of permanent beds was limited to what local services providers who wished to operate RTFs proposed to create and, in 1995, the number of beds reached 518 and has not increased since then. *See id.* In addition, in the mid–1990's, the number of beds was further limited by a Governor's moratorium on the development of institutional mental health beds.

On July 15, 2000, OMH promulgated emergency regulations authorizing the opening of nineteen additional temporary beds for New York City children. *See id.* ¶ 20. Such beds were to be created only in existing RTFs where space and programming capacity could be found and were to be in service until September 30, 2001. *See id.* OMH claims that there is no more existing space which could be converted for New York City residents. *See* Statement of Disputed Material Facts in Opposition to Plaintiffs' Motion for a Partial Summary Judgment ("Def.'s Rule 56.1"), ¶ 25.

---

1. Individuals qualify as "categorically needy" if they are eligible for assistance under other federal programs. *See id.* ¶ 2.

2. "Medically needy" individuals are whose income and assets are within federal financial limitations but are too high to qualify for "categorically needy" status.

The services provided by RTFs are covered by the Medicaid Act. *See id.* ¶ 5. They are created and operated by private, not-for-profit mental health care providers through contracts with OMH and are licensed by OMH. *See id.* ¶ 14.

An RTF is a 24–hour residential psychiatric facility providing active treatment under the direction of a physician to persons from age five to age twenty-one. *See id.* ¶ 10. RTFs are not psychiatric centers or hospitals, but are a subclass of inpatient facilities licensed and accredited as hospital services. *See id.* ¶ 11. RTFs provide services to emotionally disturbed, mentally ill children who are stabilized and do not require psychiatric hospitalization, but cannot remain at home or in the community for treatment. *See id.* ¶¶ 12, 13.

RTFs are typically located in campus-type settings, often providing living arrangements in small, home-like apartments and cottages. *See id.* ¶ 12. Most activities, such as school and recreation, take place on the grounds. *See id.* RTFs are less restrictive and less intensively staffed than hospital-based programs, which serve acutely ill children with a high level of medical and psychiatric needs for short periods of time. *See id.* ¶ 13. RTFs are also more intensively staffed and provide a wider range of services than community residences and non-residential community-based programs. *See id.*

There are nineteen RTFs in New York State. *See id.* ¶ 15. They range in size from fourteen to fifty-six beds and are administered in five geographical regions designated by OMH as the Western Region, Central Region, Hudson River Region, New York City Region, and Long Island Region. *See id.*

RTF programs are typically configured to serve children by age and gender. *See id.* ¶ 16. They are not restricted to children with particular diagnoses or problems, except that one fourteen-bed program in the Western Region serves eligible children who are also hearing impaired and a portion of one fifty-six-bed program in New York City serves eligible children diagnosed with mental illness and mental retardation. *See id.* ¶ 17.

Determinations of eligibility for RTFs are made by a preadmission certification committee ("PACC") established in each of the five geographical regions in which the RTFs are located. *See id.* ¶ 24. Children are referred to PACCs either by a parent, guardian, or other interested party such as a school psychologist, social worker, or medical professional. *See* Def.'s Rule 56.1, ¶ 7. A person over the age of eighteen may also self-refer; this rarely happens. *See id.* The actual application must be completed by a mental health professional and submitted to the regional RTF Case Manager. *See id.* ¶ 8. The Case Manager reviews the application for completeness and sends it to the members of the PACC prior to the PACC meeting, which takes place every four to six weeks. *See id.*

Each PACC is operated by an independent mental health organization in its region pursuant to a contract with OMH and is staffed with five professionals credentialed in psychiatry, medicine, psychology, social work, and education who have experience in the assessment and treatment of the mentally ill, preferably children and youth. *See* Pl.'s Rule 56.1, ¶¶ 25, 26. PACCs meet every three to six weeks to review records and documents of children referred for RTF certification. *See id.* ¶ 27. Once a complete application package is received by PACC, the determination of a child's eligibility for RTF must be made within 30 days. *See id.* ¶ 28. When PACC determines that a child meets the qualifications for RTF, it certifies the child as eligible for admission. *See id.* ¶ 29.

A child is eligible for RTF services if he or she is between the ages of five and twenty-one, is mentally ill, and meets the criteria enumerated in New York State mental health regulations. *See id.* ¶ 22. To qualify under the eligibility criteria, an applicant must have a current diagnosis of mental disorder and a serious and persistent psychopathology. *See id.* There also has to be a determination that other mental health services, except for a hospital, do not meet the child's individual needs and the proper treatment of the child's psychiatric condition requires care and treatment under the direction of a physician within a residential

treatment facility. *See id.* A child must also not present a likelihood of serious harm to others. *See id.*

Every child certified as eligible for admission to RTF is placed on a waiting list for an RTF bed. *See id.* ¶ 30. This waiting list has existed continuously since the mid to late 1980's. *See id.* ¶ 31. For administrative purposes, the waiting list is divided into two categories: the "eligibility list" and the "active waiting list." *See id.* ¶ 33. The "eligibility list" contains all children certified as qualified by PACC. *See id.* ¶ 34. The "active waiting list" contains children who are eligible for an RTF bed and are in a position to accept an RTF placement immediately if one becomes available. *See id.* ¶ 37.

Children placed on the "active waiting list" receive priority for admission to facilities in their geographical region or residence and according to the seriousness of their conditions and circumstances. *See id.* ¶ 37. In determining the child's priority for service, PACC looks at how safe the child is in the current environment, what kind of mental health services the child is receiving, and to what extent, the appropriateness and viability of the current setting, and the expected ability of the child to improve in an RFT setting. *See* Def.'s Rule 56.1, ¶ 10.

The "active waiting list" is recorded weekly. *See* Pl.'s Rule 56.1, ¶ 38. For the past few years, it has contained an average of 200 children. *See id.* Children on the "active waiting list" typically wait for several months before they are placed in an RTF. *See id.* ¶ 39. In May 2000, children had been waiting for placement at least five months and in some cases over a year. *See id.* The average length of wait for children on the "active waiting list" on April 2, 2001, April 10, 2001, and May 7, 2001, respectively was (1) 5.4 months in the Central Region; (2) 3.3 months, 3.8 months, and 3.8 months in the Long Island Region; (3) 3 months in the Hudson Valley Region; (4) 3.5 months, 3.6 months, and 4.3 months in the Western Region; and (5) 5.7 months, 6.1 months, and 4.2 months in the New York City Region. *See id.* ¶ 40. As of February 11, 2002, there were 163 children on the "active waiting list" and the statewide average wait was 3.3 months, with a range of 1.5 months in the Western Region to 4.1 months in the Hudson River Region. *See* Def.'s Rule 56.1, ¶ 16. Two children in the New York City Region were awaiting admission for 11 months. *See id.* ¶¶ 16, 20.

While waiting for an assignment to an RTF, children on the RTF "active waiting list" are placed either in psychiatric centers and local psychiatric hospitals, at home, in a residential foster care setting, a residential mental health setting, or an adult or juvenile jail. *See* Pl.'s Rule 56.1, ¶ 41. The RTF Case Managers are responsible for communicating with the referral source to ensure that they have knowledge of any change in the child's condition which might affect the child's placement. *See* Def.'s Rule 56.1, ¶ 15.

OMH does not plan to build or open any additional permanent or temporary RTF beds or make the nineteen temporary beds permanent. *See* Pl.'s Rule 56.1, ¶ 61. OMH's position is that expanding the RTF program would be costly and time-consuming. *See* Def.'s Rule 56.1, ¶ 24. OMH hopes to alleviate the demand for RTF services by creating other community-based services for RTF eligible and RTF-placed children. *See* Pl.'s Rule 56.1, ¶ 63. According to Michael Zuber, the Associate Commissioner and Director of the Bureau of Children and Family Services ("BCFS"), defendants have a specific goal to reduce the length of stay in RTFs, which in turn will impact the length of wait on the lists. *See* Zuber Dep. at 283.

In late 1999, the Governor and the Legislature increased OMH's budget for children's mental health services from $32 million to $42 million (the "Governor's Initiative"). *See* Def.'s Rule 56.1, ¶ 27. The enhanced budget permitted BCFS to establish and expand a number of community-based services. *See id.* ¶ 28. OMH allocated $3.1 million for forty-five RTF Transition Coordinators who serve both children currently in the existing RTF beds and those on the waiting list. *See id.* The Transition Coordinators assist the child and his or her family in preparation for the child's discharge from an RTF and continue to work with them post-discharge to prevent relapse. *See id.*

Home and Community Based Waiver for Children with a Diagnosis of Serious Emotional Disturbance is another program administered by OMH that was developed utilizing the Governor's Initiative funding. *See id.* ¶ 29; Fryc Aff. ¶ 1. The program acts both as a diversion from inpatient psychiatric hospitalization, including RTFs, and as a discharge destination for families willing to participate in the program. *See* Fryc Aff. ¶ 4. OMH intended to have 610 slots operational by March 31, 2002. *See id.* ¶ 3.

The Governor's Initiative funding was also used to develop Case Management services such as Intensive Case Management and Supportive Case Management, providing service to 1,540 clients. *See* Def.'s Rule 56.1, ¶ 29. OMH has also allocated funding for Family Support Services. *See id.* ¶ 30. This money will fund Parent Resource Centers in New York City and will be used to expand current Family Support programs outside of New York City. *See id.* Funds have been allocated for School Support Programs. *See id.* One hundred twenty-five slots have been developed for the Family Based Treatment Program in New York City, which maintains children in the community and diverts them from placement in residential facilities. *See id.* ¶ 31. One hundred twenty new Community Residence beds are also being developed. *See id.* According to defendants, these beds will provide both a diversion form institutionalization, as well as a "step down" from RTFs and hospitals. *See id.*

Pursuant to the Governor's Initiative, the Office of Child and Family Services ("OCFS") residential and detention facilities will have Mobile Mental Health Teams staffed by OMH. *See id.* ¶ 32. The Home Based Crisis Intervention program, an intensive six to eight week program which provides short term crisis services in the home to the child and family, has also received funding. *See id.* ¶ 33. Finally, OMH has allocated funds for Clinical Infrastructure and training to establish Single Point of Access service coordination, which will centralize referrals and requests for mental health services through one entity at the local level. *See id.*

At this point, OMH cannot predict whether these new community-based services will be able to meet the individual needs of RTF eligible children, or whether such children will not continue to need the RTF level of care. *See* Pl.'s Rule 56.1, ¶ 65.

### Discussion

### Motion for Class Certification Pursuant to Rule 23(c)(1)

#### (1)

In order to certify a class, a litigant must satisfy the four requirements of Rule 23(a) of the Federal Rules of Civil Procedure ("FRCP") and demonstrate that the proposed class action fits into one of the three categories described in Rule 23(b). *See Green v. Wolf Corp.,* 406 F.2d 291, 298 (2d Cir.1968). Although the plaintiff bears the burden of proving that its proposed class is appropriate for certification, *see Harrison v. Great Springwaters of Am.,* 1997 WL 469996, at *3 (E.D.N.Y. June 18, 1997), the plaintiff is not obliged to make an extensive evidentiary showing in support of its motion. *See Follette v. Vitanza,* 658 F.Supp. 492, 505 (N.D.N.Y.1987), *vac'd in part on other grounds,* 671 F.Supp. 1363 (N.D.N.Y.1986). Moreover, in considering a motion for class certification, a court must assume the truth of the plaintiff's allegations. *See Shelter Realty Corp. v. Allied Maint. Corp.,* 574 F.2d 656, 661, n. 15 (2d Cir.1978); *Ventura v. New York City Health and Hosp. Corp.,* 125 F.R.D. 595, 598 (S.D.N.Y.1989); *DeAllaume v. Perales,* 110 F.R.D. 299, 305 (S.D.N.Y. 1986) ("[F]or purposes of determining class certification issues, the allegations are taken as true and the merits of the complaint are not examined.").

In pertinent part, Rule 23(a) of the FRCP provides that:

One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claim or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative

parties will fairly and adequately protect the interests of the class.

Fed.R.Civ.P. 23(a). Each of these requirements will be addressed in turn.

■ First, the numerosity requirement is satisfied when the class is numerous enough to make ordinary joinder of all members impractical. The plaintiff is not obligated to identify the exact number of class plaintiffs. *See Robidoux v. Celani*, 987 F.2d 931, 935 (2d Cir.1993). "[A] class action may proceed upon estimates as to the size of the proposed class," *In re Alcoholic Beverages Litig.*, 95 F.R.D. 321, 324 (E.D.N.Y.1982), and "courts may 'make common sense assumptions' to support a finding of numerosity." *Weissman v. ABC Fin. Servs., Inc.*, 203 F.R.D. 81, 83–84 (E.D.N.Y.2001) (quoting *Pecere v. Empire Blue Cross & Blue Shield*, 194 F.R.D. 66, 69 (E.D.N.Y.2000)). Generally, "numerosity is presumed at a level of 40 members." *Consolidated Rail Corp. v. Town of Hyde Park*, 47 F.3d 473, 483 (2d Cir.1995).

In this case, plaintiffs point to the following for support of their numerosity claim: (1) in late 1999, defendant Stone and the OMH publicly acknowledged that there were approximately 400 children statewide who were on the official waiting list for RTFs; (2) defendants admitted in their answer that defendant Stone "in meeting with RTF providers during 1999, commented that the RTF waiting list was nearly 400"; (3) in a report issued in December 1999, by the Citizens' Committee for Children of New York Inc., that organization found that "according to the most recent data available, 387 children with serious emotional disturbance are certified by the New York State Office of Mental Health (SOMH) as needing placement in a hospital-like RTF and are waiting for an available bed"; and (4) at the April 10, 2002 status conference in this case with Magistrate Judge Mann, defendants' counsel represented to the court that, at that time, more than 200 children were on the waiting list for an RTF placement. Moreover, the record supports plaintiffs' contention that for the past few years, the waiting list has contained an average of 200 children. *See* Pl.'s Rule 56.1, ¶ 38 (citing RTF Active Waitlist as of April 10, 2001; Bigley Dep. at 120; Zuber

Dep. at 107). Furthermore, plaintiffs correctly point out that, because children are constantly entering and leaving the class, the membership of the class is fluid and, thus, joinder is impracticable. Accordingly, plaintiff provided sufficient evidence to support a finding of numerosity.

■ Second, to satisfy the requirement of commonality, the plaintiff must demonstrate that common questions of law or fact are at the core of the cause of action alleged by the plaintiff. Here, defendants' failure to provide RTF placement for all children who have been found eligible for such placement with reasonable promptness in violation of the Medicaid Act and defendants' failure to provide such placement in violation of the ADA are at the core of plaintiffs' complaint. Thus, the commonality requirement is met. *See Brown v. Giuliani*, 158 F.R.D. 251, 268 (E.D.N.Y.1994) ("[T]he existence of factual variations in the types of irreparable injury suffered or in the length of the delay does not preclude class certification.").

■ Third, plaintiff must demonstrate typicality. The typicality requirement "is satisfied when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability." *In re Drexel Burnham Lambert*, 960 F.2d 285, 291 (2d Cir.1992). Minor variations among individual plaintiffs' fact patterns do not undermine the typicality requirement. *See Robidoux*, 987 F.2d at 936–37.

■ Plaintiffs argue that the representative plaintiffs' claims are typical of the class claims because they arise from the defendants' same general course of conduct toward mentally-disabled children who have been determined to be in need of an RTF and because such claims raise the same legal theories and arguments. "When it is alleged that the same unlawful conduct was directed at or affected both the named plaintiff and the class sought to be represented, the typicality requirement is usually met irrespective of minor variations in the fact patterns underlying individual claims." *Id.* Accordingly, plaintiffs have met the requirement of typicality.

■ Finally, to satisfy the fourth requirement of Rule 23(a), plaintiffs must demonstrate that "the representative parties will fairly and adequately protect the interests of the class." The "adequate representation" inquiry has two prongs: "first, class counsel must be qualified, experienced and generally able to conduct the litigation. Second, the class members must not have interests that are antagonistic to one another." *Harrison*, 1997 WL 469996, at *5 (quoting *D'Alauro v. GC Servs. Ltd. Partnership*, 168 F.R.D. 451, 457 (E.D.N.Y.1996)).

Plaintiffs contend that "the interests of the representative parties are coextensive with and in no way antagonistic to the interests of the class as a whole." *See* Pl. Mot. for Class Cert. at 14. As far as the class counsel is concerned, plaintiffs are represented by the Legal Aid Society of the City of New York, which, plaintiffs maintain, "enjoys a wide reputation for the devotion of its staff and the quality of its service." *See id.* (citing *Blum v. Stenson*, 465 U.S. 886, 891 n. 3, 104 S.Ct. 1541, 1545, 79 L.Ed.2d 891 (1984)). In addition, plaintiffs are represented by Stein and Schonfeld, which, according to plaintiffs, is "a private law firm that has substantial experience in litigating mental health issues" and has experience in complex class action litigation. *See* Pl. Mot. for Class Cert. at 14. Since defendants have not raised any issue concerning the adequacy of either the class representatives or class counsel and there is no reason to question plaintiff's assertions, plaintiffs have satisfied the adequacy of representation requirement.

### (2)

In addition to satisfying the requirements of Rule 23(a), a potential class action must qualify under one of the categories set forth in Rule 23(b). Plaintiff relies on Rule 23(b)(2), which allows class certification if the moving party shows that the defendants have "acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole." Fed.R.Civ.P. 23(b).

Plaintiffs maintain that class certification is necessary in this case to prevent the absent class members' claims from becoming moot despite the possible mootness of the representative plaintiffs' individual claims and to preserve the court's power to supervise relief should judgment be rendered in favor of plaintiffs. There is a long line of cases in the Second Circuit allowing class actions that seek to enjoin governmental actions. *See Brown*, 158 F.R.D. at 269 (citing *Robidoux*, 987 F.2d at 937; *Barnett v. Bowen*, 794 F.2d 17 (2d Cir.1986); *Cutler v. Perales*, 128 F.R.D. 39, 45 (S.D.N.Y.1989); *Jane B. v. New York City Dep't of Soc. Serv.*, 117 F.R.D. 64, 70 (S.D.N.Y.1987); *Lewis v. Gross*, 663 F.Supp. 1164, 1169 (E.D.N.Y. 1986); *Ellender v. Schweiker*, 550 F.Supp. 1348, 1349 (S.D.N.Y.1982); *RAM v. Blum*, 533 F.Supp. 933, 938 (S.D.N.Y.1982)). Here, plaintiffs are seeking injunctive relief to reform a continuing government policy or practice. Their complaint is about defendants' institutional failure to provide reasonably prompt placement in RTFs; it is "not merely a cumulation of individual cases." *Id.* Moreover, since all of the named plaintiffs have already been provided RTF placements, this action would become moot without class certification. Accordingly, class certification is appropriate in this case. *See Dajour B. v. City of New York*, 2001 WL 1173504, at *11 (S.D.N.Y. Oct. 3, 2001) (courts have found exceptions to the proposition that class certification should be denied when pursuit of the claim in a class action would be "largely a formality" or "superfluous" when problems of mootness on the part of the named plaintiffs might otherwise prevent a class of injured persons from obtaining injunctive relief to reform a continuing policy or practice) (citing *Monaco v. Stone*, 187 F.R.D. 50, 63 (E.D.N.Y.1999); *Alston v. Coughlin*, 109 F.R.D. 609, 612 (S.D.N.Y.1986); *Jane B.*, 117 F.R.D. at 72; *Ashe v. Board of Elections*, 124 F.R.D. 45, 51 (E.D.N.Y.1989)).

### Motion for Partial Summary Judgment

### (1)

■ Plaintiffs argue that they are entitled to summary judgment on their claim that defendants have violated and continue to violate plaintiffs' right to receive Medicaid services with "reasonable promptness," a right

guaranteed by the Medicaid Act, 42 U.S.C. § 1396a(a)(8).

Section 1396a(a)(8) provides:

A State plan for medical assistance must ... provide that all individuals wishing to make application for medical assistance under the plan shall have opportunity to do so, and that such assistance shall be furnished with reasonable promptness to all eligible individuals.

42 U.S.C. § 1396a(a)(8).

Furthermore, a regulation provides that the responsible state agency "must," among other things, "[f]urnish Medicaid promptly to recipients without delay caused by the agency's administrative procedures," and "[c]ontinue to furnish Medicaid regularly to all eligible individuals until they are found to be ineligible." 42 C.F.R. § 435.930(a)–(b). Another regulation states that "[t]he agency must establish time standards for determining eligibility and inform the applicant of what they are." 42 C.F.R. § 435.911(a). The time periods are not to exceed "[n]inety days for applicants who apply for Medicaid on the basis of disability" or "[f]orty-five days for all other applicants." 42 C.F.R. § 435.911(a)(1)–(2). Finally, the agency "must not use the time standards" as "a waiting period." 42 C.F.R. § 435.911(e)(1).

Although whether the "reasonable promptness" clause of § 1396a(a)(8) gives rise to a federal claim has not been addressed by the Second Circuit, other courts have held that it creates a statutory right that may be enforced pursuant to 42 U.S.C. § 1983. *See Reynolds v. Giuliani*, 35 F.Supp.2d 331, 341 (S.D.N.Y.1999) (citing *Doe v. Chiles*, 136 F.3d 709 (11th Cir.1998); *Sobky v. Smoley*, 855 F.Supp. 1123, 1146–47 (E.D.Cal.1994); *Wellington v. District of Columbia*, 851 F.Supp. 1, 5 (D.D.C.1994)). *See also Bryson v. Shumway*, 177 F.Supp.2d 78 (D.N.H.2001); *Boudreau v. Ryan*, 2001 WL 840583 (N.D.Ill. May 2, 2001); *Boulet v. Cellucci*, 107 F.Supp.2d 61 (D.Mass.2000).

■ When determining whether a particular statutory provision gives rise to a federal right, it has to be ascertained whether (1) Congress intended that the provision in ques-

tion benefit the plaintiff, *see Wright v. City of Roanoke Redevelopment & Housing Auth.*, 479 U.S. 418, 430, 107 S.Ct. 766, 774, 93 L.Ed.2d 781 (1987), (2) the statute is not so "vague and amorphous" that its enforcement would strain judicial competence, *id.*, 479 U.S. at 431–432, 107 S.Ct. at 774, and (3) the statute unambiguously imposes a binding obligation on the States, i.e., the provision giving rise to the asserted right must be couched in mandatory, rather than precatory, terms. *See Wilder v. Virginia Hosp. Ass'n*, 496 U.S. 498, 510–511, 110 S.Ct. 2510, 2518, 110 L.Ed.2d 455 (1990).

"The plain language of the provision's reasonable promptness clause is clearly intended to benefit Medicaid eligible individuals," such as plaintiff children found to be eligible for RTF placement in this case. *Doe*, 136 F.3d at 715; *see also Boudreau*, 2001 WL 840583, at *8; *Boulet*, 107 F.Supp.2d at 72. Thus, the first factor is met. Next, "section 1396a(a)(8) requirement that 'assistance shall be furnished with reasonable promptness to all eligible individuals' presents a sufficiently specific and definite standard readily susceptible to judicial assessment." *Doe*, 136 F.3d at 717; *see also Boudreau*, 2001 WL 840583, at *9; *Boulet*, 107 F.Supp.2d at 72. Finally, "[t]he language of the statute is undoubtedly cast in mandatory rather than precatory terms." *Doe*, 136 F.3d at 718 (citing 42 U.S.C. § 1396a(a)(8) ("A state plan for medical assistance *must* ... provide that all individuals wishing to make application for medical assistance under the plan *shall* have the opportunity to do so, and that such assistance *shall* be furnished with reasonable promptness to all eligible individuals.") (emphasis added)); *see also Boudreau*, 2001 WL 840583, at *9. Accordingly, plaintiffs have a federal right to reasonably prompt placement in RTFs which they can enforce under 42 U.S.C. § 1983.[3]

(2)

■ Plaintiffs argue that "reasonable promptness" requirement prohibits the use of waiting lists for individuals eligible for Medicaid assistance and requires the provision of services in no more than thirty days

---

3.  Defendants do not dispute this point.

in this case because a New York mental health regulation provides that "[o]nce all necessary information has been obtained, an eligibility determination shall be made within 30 calendar days." 14 N.Y.C.R.R. § 583.9(k)(2). Defendants reject application of the thirty-day time line and argue that plaintiffs are not entitled to summary judgment because the time on the wait list is not excessive and because, unlike the benefits that are commonly the subject of litigation regarding wait lists and delays, the reimbursement services sought in this case are not "one size fits all." Moreover, defendants contend that children on the RTF wait list receive mental health services which the PACC has clinically determined to be sufficient while the child is awaiting admission.

Defendants' argument that they are not in violation of § 1396a(a)(8) because children on the wait list receive sufficient mental health services is unpersuasive because "the assistance must correspond to the individual's needs, and, . . . the state has recognized that those individuals on the waiting list, . . . need the services for which they are waiting." *Boulet*, 107 F.Supp.2d at 79 (holding the fact that plaintiffs have been receiving other services and that they might be able to receive placement in large institutions cannot be sufficient to satisfy § 1396a(a)(8)). Indeed, the regulation itself states that the PACC "shall not make an eligibility determination unless it finds that available ambulatory care services and other residential placements, other than a hospital, do not meet the treatment needs of the individual child." 14 N.Y.C.R.R. § 583.8(b)(1). Thus, by definition a child found eligible for RTF placement cannot receive sufficient treatment unless he or she is receiving services either in an RTF or a hospital. Defendants concede that "children on the wait list reside in a variety of settings, with approximately half in state and general hospitals." Def.'s Rule 56.1, ¶ 21. Thus, at least half of eligible children on the wait list are not receiving services they are entitled to pursuant to defendants' own regulations and admissions.

Furthermore, the children who are placed in hospitals while awaiting RTF placement are not receiving service comparable to the one they determined eligible for either. Michael Bigley, a person working for the Deputy Director of the BCFS, testified that the hospitals are more "ward based" and the RTFs are more "campus based." Bigley Dep. at 80. Children who are placed in the hospitals, either state-operated or local, are in a more intrusive environment than they would have been in were they provided RTF placement. *See id.* at 148. Moreover, there are many programmatic differences between school programs in the RTFs and the hospitals. *See id.* at 79. For example, while RTFs have on-ground schools designed for long-term educational programs, school programs in the hospitals are much shorter in nature and design. *See id.* at 78. Thus, the services these children receive in the hospitals, do not correspond to their individual needs.

Moreover, according to Zuber, almost all of the children on the wait lists are being provided "some services," although "it may not be the appropriate level." Zuber Dep. at 112. Clearly, this cannot be characterized as sufficient. In addition, Mac Rae, a PACC coordinator, testified that a child certified for RTF placement is not receiving the same level of services he or she would be receiving in an RTF. *See* Rae Dep. at 65. Accordingly, the fact that plaintiffs are receiving some services while they are on the wait lists is not a defense to plaintiffs claim that defendants are in violation of the "reasonable promptness" requirement of § 1396a(a)(8). But this is not the end of the matter.

Neither the regulations nor case law provide a definition of "reasonable promptness" in the context of the provision, as opposed to determinations of eligibility, of Medicaid services. "In the absence of an express time for compliance, 'courts are uniquely suited to determining what is reasonable.'" *Kessler v. Blum*, 591 F.Supp. 1013, 1032 (S.D.N.Y.1984) (quoting *Cornelius v. Minter*, 395 F.Supp. 616, 621 (D.Mass.1974)).

Plaintiffs base their argument that "reasonable promptness" requirement prohibits the use of waiting lists for individuals eligible for Medicaid assistance on a decision of a district court in California concluding that "the Medicaid Act's reasonable promptness

requirement, set forth at § 1396a(a)(8), prohibits states from responding to budgetary constraints in such a way as to cause otherwise eligible recipients to be placed on waiting lists for treatment." *Sobky,* 855 F.Supp. at 1148. In *Sobky,* the court applied the reasoning of the Supreme Court's decision in *Jefferson v. Hackney,* 406 U.S. 535, 92 S.Ct. 1724, 32 L.Ed.2d 285 (1972), that noted that the reasonable promptness provision in the Aid to Families With Dependent Children ("AFDC") program was

> enacted at a time when persons whom the State had determined to be eligible for the payment of benefits were placed on waiting lists, because of the shortage of state funds. The statute was intended to prevent the States from denying benefits, even temporarily, to a person who has been found fully qualified for aid.

*Jefferson,* 406 U.S. at 545, 92 S.Ct. at 1731.

The court in *Sobky* went on to say that the "Court's understanding of the purpose of the reasonable promptness provision [in *Jefferson*] is confirmed by the relevant Conference Committee report, which noted that '[t]he requirement to furnish assistance with reasonable promptness will still permit the States sufficient time to make adequate investigations but will not permit them to establish waiting lists for individuals eligible for assistance.'" *Sobky,* 855 F.Supp. at 1148 (quoting Conf. Rep. No. 2271, 81st Cong., 2d Sess. (1950), reprinted in 1950 U.S.C.C.A.N. 3287, 3482, 3507).

However, the reasoning of *Jefferson* is not entirely applicable to this case. Although distribution of welfare money, which was an issue in *Jefferson,* can be expected to occur without delays, immediate placement in RTFs upon finding of eligibility does not appear to be reasonable or practical. Thus, in *Boulet,* the court stated that "the waiting list violates the 'reasonable promptness' requirement *if settings are available* for the services plaintiffs request." *Boulet,* 107 F.Supp.2d at 79 (emphasis added). In this case, RTF beds for placement of children on the wait lists are unavailable. Accordingly, it is not conceivable for the state to provide immediate placement in facilities that do not exist. Although one might argue that defen-

dants' problem is self-induced, it is motivated by defendants' goal to create community-based services that are less institutional in nature than RTFs. In addition, immediate placement may be impractical in this case because RTF placement involves the process of matching a child with an appropriate RTF.

A number of courts have observed that "even if a time period is not specifically mentioned, delays of several years could be considered 'far outside the realm of reasonableness.'" *Boudreau,* 2001 WL 840583, at *9 (citing *Doe,* 136 F.3d at 717; *Lewis v. New Mexico Dep't of Health,* 94 F.Supp.2d 1217, 1235–36 (D.N.M.2000)); *see also Boulet,* 107 F.Supp.2d at 72 ("[i]n all cases, waiting periods of many years are outside of the zone of reasonableness.") Defendants offer evidence indicating that, as of February 11, 2002, the statewide average wait was 3.3 months with a range from 1.5 months in the Western Region to 4.1 months in the Hudson River Region. On the other hand, defendants' submissions also disclose the fact that there are children who have been on the wait list for much longer periods of time. For example, as of February 15, 2002, there was a child who spent ten months on the wait list, a child who spent nine months on the wait list, and three children who spent eight months on the list in the Hudson River Region. In the New York Central Region, three children were awaiting placement for six months and one child was on the list for seven months.

In *Boulet,* the court stated that, although a regulation providing that a state's time standards for determining applicants' eligibility may not exceed ninety days is focused on eligibility determinations rather than the actual provision of services, "it still gives some guidance to courts attempting to decide what time periods may be considered reasonably prompt in the larger context." *Boulet,* 107 F.Supp.2d at 73. Plaintiffs urge the court to adopt the time schedule established in the New York mental health regulation which states that "[o]nce all necessary information has been obtained, an eligibility determination shall be made within 30 calendar days." 14 N.Y.C.R.R. § 583.9(k)(2). However, in *Boulet,* the court was concerned with reason-

**38**

ably prompt placement of mentally-retarded persons. *See Boulet,* 107 F.Supp.2d 61. Plaintiffs in this case suffer from mental conditions that are fluctuating in nature and vary in seriousness from child to child. Therefore, placement of these children into RTFs requires time and flexibility to match each eligible child and an appropriate treatment program. Accordingly, plaintiffs' suggestion that "reasonable promptness" in this case means that defendants have to provide RTF placements in 30 days is no more reasonable than expecting defendants to provide immediate placement.

The 90–day waiting period which can be extracted from the federal regulation setting a time period for determining eligibility, *see* 42 C.F.R. § 435.911(a)(1)–(2), does not provide a solution to the problem at issue either. Applying such a standard at this time would be completely arbitrary because the record contains no information suggesting that the magic number ninety bears any relation to what is reasonable in this case. As the record now stands, it is impossible to determine what "reasonable promptness" means in a case where the information available to the court is insufficient to ascertain what is involved in the process of matching a child with an appropriate RTF and developing other community-based services for RTF eligible and RTF-placed children, which defendants claim will decrease the length of time on the wait lists and offer better services under less restrictive conditions. In sum, at this point I am not persuaded of the soundness of plaintiffs' legal position and of the defendants' justifications for not creating additional RTF beds.

### Conclusion

Having satisfied the Rule 23(a) requirements of numerosity, commonality, typicality and adequate representation and having qualified under the Rule 23(b)(2) category, plaintiff class is certified, and the following class definition is adopted:

> All New York State children with psychiatric disabilities who have been or will be found by defendants to be appropriate for

placement in a Residential Treatment Facility and who have not been or will not be provided with such placement with reasonable promptness.

Plaintiffs' motion for partial summary judgment on their claim that defendants have violated and continue to violate their right to receive Medicaid services with "reasonable promptness" as required by the Medicaid Act is denied.

The case is respectfully referred to Magistrate Judge Roanne L. Mann for settlement discussions and/or a Report and Recommendation on the issue of "reasonable promptness." Without in any way intending to limit her inquiry, I would request that the report address the justifications offered by the defendants for the refusal to create additional RTF beds.

